UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEFFREY ROTH,

                Plaintiff,

        v.

2810026 CANADA LIMITED,
2810034 CANADA LIMITED,
FREDERICK GROUP INC., and
AMARJIT SINGH,

                Defendants.

_____

2810026 CANADA LIMITED,
2810034 CANADA LIMITED, and
FREDERICK GROUP INC.,

                Third-Party Plaintiffs,

        v.

PAMELA BAUMAN,

                Third-Party Defendant.

_____

                              REPORT
                              and
              RECOMMENDATION
           ------------------------------
                 DECISION
                   and
                 ORDER

           13-CV-00901A(F)

APPEARANCES:        DAVID W. POLAK, ESQ.
                         Attorney for Plaintiff
                         3686 Seneca Street
                         West Seneca, New York  14224

                         WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
                         Attorneys for Defendants and Third-Party Plaintiffs
                         BEATA SHAPIRO, of Counsel
                         260 Franklin Street
                         14th Floor
                         Boston, Massachusetts  02110
                                and
                         BRIAN DEL GATTO, of Counsel
                         1133 Westchester Avenue
                         White Plains, New York  10604

FELDMAN KIEFFER, LLP
Attorneys for Third-Party Defendant
ADAM C. FERRANDINO, of Counsel
110 Pearl Street
Suite 400
Buffalo, New York  14202

## JURISDICTION

On September 12, 2013, this case was referred to the undersigned by Honorable Richard J. Arcara for all pretrial matters including preparation of a report and recommendation on dispositive motions.  The matter is presently before the court on motions for summary judgment filed by Third-Party Defendant Bauman (R Dkt. 70),[1] filed February 13, 2017, by Plaintiff Roth (R Dkt. 71), filed February 14, 2017, and by Third-Party Plaintiffs (B Dkt. 54), and on Third-Party Plaintiffs' request for permission to amend the ¶ 14 of the Third-Party Complaint (R Dkt. 75 at 20-22).[2]

## BACKGROUND

On June 21, 2013, Plaintiff Jeffrey Roth ("Plaintiff" or "Roth"), filed a Summons and Complaint in New York Supreme Court, Erie County, against Defendants 2810026 Canada Limited ("2810026 Canada Ltd."), 2810034 Canada Limited ("2810034 Canada Ltd."), Frederick Group Inc., and Amarjit Singh ("Singh") (together, "Defendants"),

---

[1] In the interests of clarity and simplicity, and to avoid overlooking any arguments relevant to the pending motions, the court considers all papers filed in two related actions, including the instant action commenced by Jeffrey Roth, 13-CV-009801A(F) ("Roth Action"), and a separate action commenced by Pamela Bauman, 15-CV-00374A(F) ("Bauman Action"), referring to documents filed in the Roth Action as "R Dkt. __," and to documents filed in the Bauman Action as "B Dkt. __."  In an effort to avoid ungainly construction, where documents are filed multiple times either in the same action or in both actions, the court references only one of the filings.  Furthermore, because all parties have filed numerous papers with the same or similar titles in both actions, and have sometimes filed the same papers in both actions, the court, in referencing any document, does not assign any document an abbreviated name but simply refers to each document only by its relevant docket item number.

[2] Because the dispositive and non-dispositive motions before the court are inter-related, the court addresses all pending motions in this combined Report and Recommendation and Decision and Order.

seeking to recover for personal injuries Roth allegedly sustained following an automobile accident on November 9, 2011, in Buffalo, New York ("Buffalo"). In particular, Roth was a passenger in a vehicle driven by one Pamela J. Bauman ("Bauman"), which was involved in a collision with a tractor-trailer owned and operated by Defendant Singh. Although the Complaint did not allege an amount in controversy, Roth's counsel conveyed a settlement demand for $ 900,000 ("Settlement Demand"),[3] following the receipt of which Defendants 2810026 Canada Ltd., 2810034 Canada Ltd. and Frederick Group, Inc. ("Corporate Defendants" or "Third-Party Plaintiffs"),[4] on September 4, 2013, removed the action to this court pursuant to 28 U.S.C. § 1446 ("§ 1446"), asserting complete diversity of citizenship between the parties, in accordance with 28 U.S.C. § 1332 ("§ 1332"), as the basis for subject matter jurisdiction in this court.[5] On September 11, 2013, Third-Party Plaintiffs filed their Answer and Third-Party Complaint (R Dkt. 4), asserting cross-claims for indemnification and contribution against Bauman ("Third-Party Defendant" or "Bauman"), should any of the Third-Party Plaintiffs be found liable to Roth for the injuries he allegedly sustained as a result of the accident. Bauman's Answer to the Third-Party Complaint was filed November 15, 2013 (R Dkt. 12), and Singh's Answer was filed February 5, 2015 (R Dkt. 27), asserting cross-claims for contribution and indemnification against Bauman.[6]

---

[3] No copy of the Settlement Demand is in the record.
[4] The relationship between the Corporate Defendants to the tractor-trailer is not clearly stated in the record.
[5] Because Singh had yet to be served with the Summons and Complaint, Singh was not required to, and in fact did not, join in the removal. *See* 28 U.S.C. § 1446(b)(2)(A) (providing that "all defendants who have been properly joined and served must join in or consent to the removal of the action.").
[6] Although Singh is represented by the same legal counsel representing Corporate Defendants, Singh has not joined as a Third-Party Plaintiff in the Third-Party Complaint against Bauman, nor in Corporate Defendants' motions.

On November 3, 2014, Bauman commenced in New York Supreme Court, Erie County, a separate personal injury action seeking to recover from the same Defendants monetary damages for personal injuries she allegedly sustained as a result of the same accident.  The Corporate Defendants filed their answer on March 27, 2015, and served Bauman with a Notice to Admit the amount in controversy exceeds $ 75,000.  When Bauman failed to deny or object to the Notice to Admit, Corporate Defendants, pursuant to § 1446, removed the action to this court, asserting subject matter jurisdiction based on complete diversity between the parties under § 1332, where the action was assigned Dkt. 15-CV-00374A(F) ("Bauman Action").  Although the Roth Action and the Bauman Action were consolidated on October 6, 2015, for purposes of discovery, scheduling and case administration associated with pre-trial matters, the cases remain separate for all other purposes.[7]  R Dkt. 37; B Dkt. 6.

On December 16, 2016, Corporate Defendants moved to dismiss the Bauman Action for failure to comply with court-ordered discovery (B Dkt. 49) ("Motion to Dismiss").

On February 6, 2017, Roth and Bauman (together, "Plaintiffs"),[8] filed the Affirmation of David W. Polak, Esq. in Opposition to Defendants' Motion to Dismiss (B Dkt. 53), attaching Exhibit D to B Dkt. 41 (B Dkt. 53-1), and Exhibit B to B Dkt. 41 (B Dkt. 53-2).

---

[7] Although the Roth Action and the Bauman Action were not consolidated for purposes of motion practice, including dispositive motions, both parties have erroneously filed various motion papers in the wrong case, and at other times have filed the same papers in both actions and also have filed papers containing arguments pertaining to motions filed in both cases.

[8] Because the separate actions filed by Roth and Bauman are based on the same incident, the court refers to them together as "Plaintiffs" when doing so is supported by the context of this Report and Recommendation/Decision and Order.

On February 13, 2017, Corporate Defendants filed their motion for summary judgment (B Dkt. 54) ("Corporate Defendants' Summary Judgment Motion"), asserting Roth is unable to establish he sustained a "serious injury" as defined under N.Y. Ins. Law § 5102(d)[9] ("§ 5102(d)"), and the Memorandum of Law in Support of Defendants 2810026 Canada Limited, 2810034 Canada Limited and Frederick Group Inc.'s Joint Motion for Summary Judgment (B Dkt. 55), attaching exhibits A through H (B Dkt. 55-1 through 55-8). Also filed on February 13, 2017, was Third-Party Defendant's motion for summary judgment (R Dkt. 70), attaching the Attorney Affirmation of Adam C. Ferrandino, Esq. (R Dkt. 70-1), with exhibits A through F (R Dkt. 70-2 through 70-7), the Statement of Facts Pursuant to Local Rule 56 (R Dkt. 70-8), and the Memorandum of Law (R Dkt. 70-9).

On February 14, 2017, Roth filed Plaintiffs' Notice of Motion for Summary Judgment (R Dkt. 71) ("Plaintiff's Motion"),[10] attaching the Affirmation of David Polak, Esq. in Support of Plaintiffs' Motion for Summary Judgment (R Dkt. 71-1), with reports pertaining to four independent medical examinations ("IMEs") (R Dkt. 71-2 through 71-4), and also filed exhibits A and B (respectively, R Dkt. 72-1 and 72-2).

On February 16, 2017, Third-Party Plaintiffs filed Defendants 2810026 Canada Limited, 2810034 Canada Limited and Frederick Group Inc.'s Affirmation in Support of Motion to Dismiss all Claims by Plaintiff Pamela Bauman and Opposition to Plaintiff's Motion to Reconsider[11] (B Dkt. 57), attaching exhibit A (B Dkt. 57-1).

---

[9] Unless otherwise indicated, references to N.Y. Ins. Law are to McKinney 1984.
[10] Plaintiff's Motion was also filed as B Dkt. 72.
[11] The Motion to Reconsider pertains to a matter only before the court in the Bauman Action.

On April 6, 2017, Third-Party Defendant filed in opposition to Plaintiff's Motion the Affirmation of Adam C. Ferrandino, Esq. (R Dkt. 74), attaching exhibits A and B (respectively, R Dtk. 74-1 and 74-2), and a Memorandum of Law (R Dkt. 74-3).

On April 7, 2017, Corporate Defendants filed as a single document the Affirmation, Statement of Facts, and Memorandum of Law in Support of Defendant 2810026 Canada Limited Ltd., 2810034 Canada Limited, and Frederick Group Inc.'s Opposition to Plaintiff Bauman's Motion for Summary Judgment (R Dkt. 75), containing the Affirmation of Beata Shapiro, Esq. (R Dkt. 75 at 1-2), Defendant's Response to Bauman's Statement of Undisputed Facts (R Dkt. 75 at 2-18), and a Memorandum of Law (R Dkt. 75 at 19-25), and attaching exhibits G through I (R Dkt. 75-1 through 75-3).[12]  Also filed on April 7, 2017, was the Affirmation of David Polak, Esq., in Support of Plaintiffs' Motion for Summary Judgment on Serious Injury and Negligence (R Dkt. 76; B Dkt. 59), asserting both Roth and Bauman join in Bauman's motion, as Third-Party Defendant in the Roth Action, for summary judgment on the issue of negligence, and attaching the Affirmation of P. Jeffrey Lewis, M.D. ("Dr. Lewis") (R Dkt. 76-1), the Affidavit [ ][13] of Plaintiff Roth (R Dkt. 76-2), the Affirmation of Michael Hallett, M.D. ("Dr. Hallett") (B Dkt. 59-1), and the Affidavit of Pamela Bauman (B Dkt. 59-2).  On April 7, 2017, Corporate Defendants further filed as a single document the Affirmation,

---

[12] The court notes no exhibits denominated as A through F have been filed by Third-Party Defendant in the instant action.  Furthermore, inasmuch as Bauman did file in the Bauman Action two sets of exhibits, the first containing exhibits A through H (B Dkt. 55-1 through 55-8, Bauman), and the second containing exhibits A through J (B Dkt. 56-12 through 55-11, Bauman), because Corporate Defendants' Exhs. G through I filed in the instant action do not correspond to those exhibits denominated as G, H and I in either of the two sets of exhibits filed in the Bauman Action, the court does not presume that those exhibits denominated as A through F filed in either of the two sets of exhibits in the Bauman Action were intended as exhibits A through F in the instant action. In short, the court is unable to discern whether Corporate Defendants filed anywhere in the instant action or in the Bauman Action and exhibits intended to be considered as Exhs. A through F relative to Corporate Defendants' papers filed as R Dkt. 75.
[13] Unless otherwise indicated, brackets are added.

Statement of Facts, and Memorandum of Law in Suppor[t] of Defendant 2810026 Canada Limited [ ], 2810034 Canada Limited, and Frederick Group Inc.'s Opposition to Plaintiffs Roth and Bauman's Motion for Summary Judgment (R Dkt. 77), containing the Affirmation of Beata Shapiro, Esq. (R Dkt. 77 at 1-2), Defendant's [*sic*] Response to Plaintiff's Statement of Undisputed Facts (R Dkt. 77 at 2-19), and a Memorandum of Law (R Dkt. 77 at 20-38), and attaching exhibits A through N (R Dkt. 77-1 through 75-14).[14]

Filed on April 28, 2017, were the Affirmation of David W. Polak, Esq. (R Dkt. 78), Third-Party Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment (R Dkt. 79), Plaintiff's exhibits A through D (R Dkts. 80-1 through 80-4),[15] the Attorney Affirmation of Beata Shapiro, Esq., for Reply in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Bauman (R Dkt. 81), attaching the Appendix of Materials in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Bauman (R Dkt. 81-1), and exhibits K through U (R Dkt. 81-2 through 81-11),[16] and the Attorney Affirmation of Beata Shapiro, Esq. for Reply in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Roth (R Dkt. 82), attaching the Appendix of Materials in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Roth (R Dkt. 82-1), and exhibits I through M (R Dkt. 82-2 through 82-6).[17]

Oral argument was deemed unnecessary.

---

[14] In the interest of completeness, the court notes that Corporate Defendants' Exhs. A through F do not, based on their content, appear to be the exhibits missing with regard to Corporate Defendants' exhibits filed at R Dkt. 75-1 through 75-3.  *See* n. 11, *supra*.

[15] For unexplained reasons, the Affirmation of David W. Polak, Esq., previously filed as R Dkt, 78, was also filed as R Dkt. 80.

[16] The court notes that exhibits A through J were not included in this filing.

[17] The court further notes exhibits A through H were not included in this filing.

Based on the following, Third-Party Defendant's motion for summary judgment should be DENIED; Roth's motion for summary judgment should be DENIED; Corporate Defendants' motion for summary judgment (B Dkt. 54), should be GRANTED; Third-Party Plaintiffs' request (R Dkt. 75 at 20-22) for permission to amend ¶ 14 of the Third-Party Complaint is DISMISSED as moot or, alternatively, is GRANTED; Corporate Defendants' request to strike Roth's expert witnesses should be GRANTED in part and DENIED in part.

## FACTS[18]

**The Collision**

On November 9, 2011, Plaintiff Jeffrey Roth ("Plaintiff" or "Roth"), was a front-seat passenger in a vehicle driven by Third-Party Defendant Pamela J. Bauman ("Third-Party Defendant" or "Bauman") ("Bauman's vehicle"), in the far right-hand travel lane northbound on Interstate 190, also known as the "Niagara Thruway" or "I-190," heading toward Niagara Falls, New York where Roth intended to catch an airplane flight to Myrtle Beach, South Carolina. At the same time, an open, flat-bed tractor-trailer operated by Defendant Armajit Singh ("Defendant" or "Singh") ("the truck" or "Singh's truck"),[19] was northbound in the center travel lane of I-190. It is undisputed that as both Bauman and Singh traveled northbound on I-190 near the exit for Niagara Street, Singh's truck and Bauman's vehicle collided ("the collision"). The parties dispute which

---

[18] Taken from the pleadings and relevant motion papers filed in both the Bauman and Roth Actions. Insofar as the parties may have filed other papers containing material relevant to the pending motions, but not referenced in the motion papers, "the District Court [is] 'not required to scour the record on its own in a search for evidence'" the parties failed to present. *ABC v. NYU Hospitals Center*, 629 Fed.Appx. 46, 49 (2d Cir. Oct. 22, 2015) (quoting *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013)).

[19] At his deposition, Singh stated he was the owner of the truck. *See* R Dkt. 70-5 at 3 (Singh responding to deposition question "Do you know who owns that semi truck?" with "By myself.").

vehicle caused the collision which was not witnessed by any non-parties to either the Roth Action or the Bauman Action. Singh asserts he never saw Bauman's vehicle until he heard a noise and felt a "bounce." Plaintiffs maintain Singh's truck twice struck Bauman's vehicle, describing the impact from the first strike as a "nudge," followed only a second later by the second strike to the rear driver's-side wheel well and wheel of Bauman's vehicle, sending the vehicle into a spin. Following the collision, both Bauman and Singh steered their respective vehicles and truck to the right shoulder of I-190. Singh maintains that Bauman pulled her vehicle onto the road's right shoulder, and Singh then pulled behind Bauman's vehicle, R Dkt. 75-1 at 4 (Singh deposition testimony); whereas Plaintiffs maintain Singh pulled over to the road's right shoulder, with Bauman pulling behind the truck. R Dkt. 70-9 at 6 (citing R Dkt. 70-3 at 25-27 (Roth deposition testimony).[20]

After pulling onto I-190's right shoulder, Roth exited Bauman's vehicle and Singh exited his truck and noticed a plastic nut on the truck's passenger-side front wheel was damaged. Bauman's vehicle was damaged near the rear, driver's-side wheel. Singh said he was sorry, but denied apologizing for causing the collision, inquired whether anyone was injured, and provided Bauman with his identification and insurance information. Although Bauman had placed an emergency 911 telephone call, when no emergency vehicle quickly responded, Bauman resumed operating her vehicle, with Roth as a passenger, driving northbound on I-190, hoping Roth could still catch his flight to Myrtle Beach.[21]

---

[20] The position of the vehicle and the truck on the right-shoulder of I-190 is irrelevant to the motions before the court.
[21] Although Roth's planned travels included flying with Mr. Polak to Myrtle Beach, South Carolina where Plaintiff was to assist with the remodeling of a kitchen in a condominium owned by Mr. Polak, and

Following the collision, Singh, aided by one Keith Goodyear ("Goodyear"), who "manage[s] claims for [Defendant] 2810026 Canada Limited, Ltd.," (R Dkt. 65-1 at 6), produced a statement ("unsworn statement"), that on November 9, 2011, between noon and 12:30 P.M., while driving north on I-190, approximately one mile before the exit for the border between Canada and the United States, Singh's truck hit an eight-year old Pontiac Grand Am on the driver's side rear panel behind the vehicle's rear door.  R. Dkt. 70-7 at 4.  Immediately following the collision, Singh spoke with both Roth and Bauman, neither of who were hurt, but were in a hurry to resume their travels to the airport and did not want to miss Roth's flight.  *Id.*; R Dkt. 70-5 at 13.  Singh presented Roth and Bauman with his identification and insurance information.  R Dkt. 70-7 at 4; R. Dkt. 75-1 at 9.  According to Singh, the only damage to the vehicles was to the lug nut covers on Singh's truck tires, and some scratches to the rear panel of Bauman's vehicle.  R Dkt. 70-7 at 4.  Because neither Roth nor Bauman was injured, they did not wait for any emergency response vehicle to arrive, but instead drove off in Bauman's vehicle which remained operational.  *Id.* at 5; R Dkt. 75-1 at 17.  At his deposition, Singh explained that although he told Roth and Bauman he was "sorry" for the collision, his words were not intended as an admission that he caused the collision, but merely intended to be "nice" and "polite."  R Dkt. 70-5 at 11; R Dkt. 75-1 at 6-7.  Singh denied ever stating he was attempting to change lanes at the time of the collision, R. Dkt. 75-1 at 7-8, and denied seeing Bauman's vehicle prior to the collision.  *Id.* at 10.  Within one week after the collision, Singh, with the assistance of an unidentified person, prepared the unsworn

---

although Roth and Polak missed their intended flight, but caught a different flight the next day such that Roth did assist with the planned kitchen renovation project in Myrtle Beach, no one has asserted Mr. Polak is a fact witness and should be disqualified from further representing Roth and Bauman in the Roth and Bauman Actions.

statement for his employer.  *Id.* at 11.  According to Singh, he required assistance writing the unsworn statement because Singh has some difficulty conversing and writing in English.  R. Dkt. 75-1 at 14.

**Roth's Medical History**

Roth is the owner of Cutting Edge Contracting where he has been self-employed as a landscaper and construction contractor since 1999.  R Dkt. 77-4 at 15, 21, 49.  Roth's medical records establish Roth suffered a herniated disk in 1993 attributed to heavy lifting at work.  R. Dkt. 77-9 at 2.

In August 1997, Roth struck a guardrail while riding a motorcycle, partially severing his left forearm and sustaining a torn left hamstring.  R Dkt. 77-9 at 2; R Dkt. 77-10 at 3.  Roth's left forearm was surgically re-attached with plates and pins, but Roth's left forearm had some significant muscle wasting with a "dent" noticeable on top of the forearm.  R. Dkt. 77-9 at 2; R Dkt. 77-10 at 2-3.

On June 2, 1999, Roth was treated by Robin Shaw, MS, ANP ("NP Shaw"), at Leroy Family Care in Leroy, New York for complaints of right knee discomfort without swelling and not attributed to any specific injury.  R. Dkt. 77-10 at 2.  NP Shaw assessed right knee strain with partial lateral ligament tear.  *Id.*  On November 1, 1999, Roth returned to Leroy Family Care complaining that his right knee had been painful since May 1999 when he hit it during work.  R Dkt. 82-3 at 14.  Although Roth thought the pain would be alleviated through exercise and wearing a knee brace, a few weeks earlier the pain increased after Roth moved a heavy load.  *Id.*  Roth's knee was not swollen or hot, but would lock and crack.  *Id.*  NP Shaw assessed right knee strain.  *Id.*

On December 29, 1999, Roth was examined by Thomas H. Ball, M.D. ("Dr. Ball"), and NP Shaw, for complaints of back pain resulting from an incident earlier that day when Roth, while carrying a vacuum, stepped from the bumper off the back of a van, and slipped and twisted. R Dkt. 82-3 at 13. Although Roth did not fall, he felt a wrenching in his back which had since tightened up, with pain radiating down his right buttock and around to both groins. *Id.* NP Shaw assessed Roth with low back strain and ordered Roth to remain off work until the following Tuesday. *Id.* On January 3, 2000, Roth was seen in follow-up by NP Shaw and Dr. Ball who assessed Roth with low back pain for which Roth was to start physical therapy at Summit Physical Therapy in Batavia, New York. *Id.* at 12. On the following Tuesday, January 4, 2000, physical therapist Christopher Muffoletto, P.T. ("P.T. Muffoletto"), evaluated Roth who continued to complain of "constant low back pain" attributed to the episode the previous Wednesday. R Dkt. 77-9 at 2-3. Since the incident, Roth had intermitted sharp pains in his hips when performing heavy lifting. *Id.* Roth's symptoms were aggravated when sitting for more than five or 10 minutes, forward bending, and driving a car. *Id.* Upon examination, Roth ambulated without any significant gait deviations, stood "fairly easily" and his posture was "characterized by reduced lumbar lordosis." *Id.* P.T. Muffoletto's impression was lumbar radiculopathy possibly secondary to degenerative disk disease, with 50% decreased lumbar flexion range of motion ("ROM"), increased lumbar pain, increased groin pain, and positive lower limb tension test. *Id.* at 2-3.

When examined by NP Shaw on January 12, 2000, in follow-up, Roth reported his low back pain "is getting quite a bit better," but Roth had yet to try any particular

lifting.  R Dkt. 82-3 at 11.  Roth was advised to complete a full month of physical therapy and cleared to return to work on January 17, 2000.  *Id.*

On January 2, 2001, Roth fell and an X-ray of Roth's left forearm taken the next day showed surgical changes and old traumatic residual but no acute fracture.  R Dkt. 77-13.

On January 6, 2002, Roth, while at work, pulled his back while moving an incorrectly bolted steel gantrey.  R Dkt. 82-3 at 10.  Roth heard a crunch and fell to the ground.  *Id.*  Roth was evaluated in the emergency room at United Memorial Medical Center, Batavia, New York, where he underwent a complete lumbosacral spine series of X-rays in connection with a lifting injury resulting in low back pain.  *Id.*; R Dkt. 77-14 at 2.  The X-rays showed a "hint of spondylosis and osteoarthritis.  Minimal narrowing of the posterior L5-S1 disc space either acquired or congenital essentially unchanged since series of 1989.  No fracture noted."  *Id.*  On June 9, 2002, Roth was examined by NP Shaw in connection with the January 6, 2002 incident, and low back pain was assessed with Roth ordered off work until January 14, 2002, following which Roth was to use caution when lifting heavy objects.  R Dkt. 82-3 at 10.

On June 11, 2002, NP Shaw examined Roth who continued to complain of low back pain in connection with the January 6, 2002 incident.  R Dkt. 82-3 at 2.  Roth reported the pain was not improving, he continued to have low back pain radiating down the buttock, denied numbness, but maintained he avoided sharp movements which caused sharp pain.  *Id.*  Roth was no longer working for his employer.  *Id.*  Physical examination revealed positive straight leg raise test on the right, normal flexion and extension, but lateral rotation to the left exacerbated right lower back pain.  *Id.*  NP

Shaw assessed low back pain, ordered an MRI, but did not prescribe physical therapy because Roth reported he continued to perform the exercises he had previously been taught at physical therapy without any improvement. *Id.*

In connection with Roth's complaints of pain following the November 9, 2011 collision, on November 15, 2011, X-rays taken of Roth's cervical spine, left shoulder, and left knee, showed an intact cervical spine, degenerative changes of the left acromioclavicular joint (shoulder), and an intact left knee. R Dkt. 77-11.

On February 7, 2012, Roth underwent arthroscopic surgery and subtotal medial meniscectomy to repair a meniscus tear on his left knee performed by Richard K. Hoy, M.D. ("Dr. Hoy"). R Dkt. 82-6 at 2-4.

At the request of Dr. Hoy, Roth, on April 3, 2012, underwent a two-part MRI arthrogram of his right shoulder.[22] B Dkt. 55-7 at 8-9. The MRI showed no labral tear but a prominent sublabral recess (anterior portion of the superior labrum (cartilage) not attached to the glenoid (shoulder socket)), no rotator cuff tear but rotator cuff tendinosis, scarring adjacent to the anterior inferior labrum but no labral tear, hypertrophic change at the acromioclavicular joint and lateral acromial downsloping and mild subacromial narrowing, but no fracture. B Dkt. 55-7 at 8. The arthrogram showed uneventful distention of the glenohumeral joint and subchondral cyst within the lower glenoid. *Id.* at 9.

The impressions of an MRI of Roth's lumbar spine without contrast, performed by Allyson Haymes, M.D. ("Dr. Haymes"), on April 27, 2012, included "straightening of lumbar lordosis presumably secondary to muscle spasm. Minimal retrolisthesis at L4-

---

[22] There is no explanation in the record why Dr. Hoy ordered the MRI of Roth's right shoulder.

L5 and L5-S1." B Dkt. 55-7 at 6. Also, degenerative disc disease "by far most severe at the lower lumbar levels. At L4-5 there is a moderately large central to left paracentral disc extrusion caudad tendency, that results in mild spinal canal narrowing, and generalized disc and facet disease at L4-5 results in mild canal narrowing and combine[s] with retrolisthesis to modestly encroach upon the L4 foramina. At L5-S1, a central to predominantly left paracentral disc extrusion is present that results in a borderline central canal caliber and more significantly narrows the L5 foramina, in combination with retrolisthesis." *Id.* at 6-7. According to Dr. Haymes, "listheses are presumed degenerative in etiology," and Dr. Haymes "detected no underlying pars defects." *Id.* at 7.

X-rays of Roth's cervical and lumbar spine were taken June 21, 2012. B Dkt. 55-7 at 2-3. The cervical spine X-ray showed "degenerative changes at C5-6, minimal anterolisthesis stable on flexion and extension view." *Id.* at 2. Roth's lumbar spine X-ray showed "no change of alignment between flexion extension view. Degenerative changes in the lower lumbar spine." *Id.* at 3.

At a post-surgery examination of his left knee by Dr, Hoy on August 13, 2012, Roth was not then taking any pain medications, his pain was "mild" and only sporadic, Roth had been discharged from physical therapy, and his "work status" was "regular duty." R Dkt. 82-6 at 2. Dr. Hoy found Roth to be "doing acceptably well" with some tenderness over the medial femoral condyle which Dr. Hoy was hopeful would resolve on its own. *Id.* at 3. At that time, Roth was working, and Dr. Hoy believed the knee injury was causally related to the collision. *Id.* Because Roth had not yet reached his

optimum recovery, Dr. Hoy refrained from expressing whether Roth would have any permanent impairment from the knee injury. *Id.*

An MRI of Roth's right shoulder performed at Dr. Hoy's request on April 29, 2014, showed a prominent anteroinferior labral tear, Perthes type (membrane torn from shoulder socket, but still partially attached), with perlosteal elevation and a para labral cyst containing injured fibers, possible periosteal, a large degenerative cystic focus in the glenoid in the subjacent bone, no Hill-Sachs lesion nor associated tear of the subscapularis, although Roth previously may have had a bony Bankart injury (injury to the ball and socket joint of the shoulder), which could account for some of the observed bony deformity, and would explain Roth's anterior instability symptoms. B Dkt. 55-8 at 5. The MRI also showed tendinosis and articular surface partial thickness tearing of fibers of the infraspinatus over the footprint without full-thickness tear rupture or retraction or atrophy, outlet narrowing beneath the a.c. joint lateral acromion, injury edema in the anterior myotendinous junction of the supraspinatus which could correlate with impingement syndromes, tendinosis long head biceps tendon without tear or subluxation, and intact pulley structures. *Id.*

On November 11, 2014, orthopedic surgeon Robert Bauer, M.D. ("Dr. Bauer"), performed an independent orthopedic medical examination on Roth whom he found to have degenerated discs in the cervical and lumbar spine, left knee tear medial meniscus, and right should impingement and glenoid cyst. R Dkt. 77-4 at 15-16. Dr. Bauer reported Roth stated he "had to modify his work activities." *Id.* at 15. Based on a review of Roth's medical records from November 15, 2011, and a physical examination of Roth, Dr. Bauer assessed Roth's overall prognosis as "fair," stating Roth's diagnosis

and symptoms are causally related to the collision, and that Roth had no history of a preexisting or subsequent injury. *Id.* Dr. Bauer recommended right shoulder arthroscopy with repair or resection of tissues, assessing Roth as not having reached pre-accident status nor medical endpoint. *Id.* at 3. On the Patient History Form Roth completed with regard to the examination, Roth indicated that his pain and numbness were of a sudden onset after the collision. *Id.* at 21.

On December 12, 2014, chiropractor George Lisjak, D.C. ("Dr. Lisjak"), performed an Independent Chiropractic Medical Evaluation on Roth. R Dkt. 77-4 at 49-55. At that time, Roth complained of constant neck pain of varying intensity associated with right upper extremity pain and paresthesia, which Roth sometimes also experienced in his left upper extremity. *Id.* at 51. Roth also complained of intermittent mid back discomfort, and constant lower back pain of varying intensity without any radicular component. *Id.* After reviewing Roth's medical history, and diagnostic imaging test results, Dr. Lisjak diagnosed Roth with C5-C6 central to left paracentral protrusion, C6-C7 central disc protrusion, pre-existing osteoarthritic degenerative change of the cervical spine with associated degenerative disc disease with manifest bulging, pre-existing minimal anterolisthesis at C5-C6 without apparent instability, and pre-existing osteoarthritic degenerative change and degenerative disc disease of the lumbar spine with narrowing of the disc space at L4-L5 and greater at L5-S1. *Id.* at 53. Dr. Lisjak's prognosis was poor because Roth's full recovery from spinal injuries attributed to the collision was doubtful. *Id.* at 53-54. Dr. Lisjak further opined the disc protrusions at C5-C6 and C6-C7 appeared to be causally related to the collision "to some degree," noting Roth sustained a significant left upper extremity injury during his

prior motorcycle accident in 1997, and the osteoarthritic degenerative changes of the cervical and lumbar spines, degenerative disc disease with manifest bulging and anterolisthesis appeared to be pre-existing. *Id.* at 54. Roth's causally-related disability was assessed as "moderate" with medical end-point having been reached with regard to chiropractic treatment for acute and sub-acute spinal injuries, but pre-accident status not having been reached. *Id.*

On January 13, 2017, Dr. Bauer performed a second Independent Orthopedic Medical Examination on Roth. R Dkt. 77-4 at 26-29. Upon reviewing Roth's medical history and physically examining Roth, Dr. Bauer's impression was degenerated cervical spine and lumbar spine with disc herniations, left knee tear medical meniscus, right shoulder impingement with glenoid cyst. *Id.* at 26-27. Dr. Bauer's overall prognosis was fair, and Roth's diagnoses and symptoms were found to be causally-related to the collision with Roth not having reached preaccident status nor medical endpoint, and having no history of pre-existing or subsequent injury. *Id.* at 28.

Also on January 13, 2017, neurosurgeon Robert J. Sarnowski, M.D. ("Dr. Sarnowski"), performed an Independent Neurosurgical Medical Evaluation on Roth regarding Roth's continued back and leg pain. R Dkt. 77-4 at 40-43. Dr. Sarnowski's diagnostic impression was lumbar discogenic disease, chronic lumbar pain, and lumbar radiculopathy, *id.* at 40, for which the ultimate prognosis was guarded with Roth remaining functional and continuing to work in a less physically demanding capacity, and not having reached his pre-accident level. *Id.* at 42. Dr. Sarnowski reported Roth's symptoms as causally related to the collision. *Id.*

In a January 15, 2015 addendum to his December 12, 2014 report, Dr. Lisjak noted that based on his recent receipt of an April 27, 2012 lumbar MRI report, Roth had osteoarthritic degenerative joint and disc changes at L2 through S1.  R Dkt. 77-4 at 57-59.  At L4-L5, there is retrolisthesis and a large central to left paracentral disc extrusion with causal migration resulting in mild spinal canal narrowing and moderate encroachment of the L4 foramina.  *Id.*  At L5-S1, there is retrolisthesis and a moderate central to predominantly left paracentral disc extrusion resulting in borderline central canal stenosis and narrowing of the L5 foramina with the disc abutting the S1 nerve roots.  *Id.*  According to Dr. Lisjak, this lumbar MRI report "explains [Roth's] complaint of lower back pain."  *Id.*  Dr. Lisjak added the L4-L5 disc extrusion and L5-S1 disc extrusion to his earlier diagnosis, stating it was possible the lumbar disc extrusions were causally related to the collision, *id.*, and the additional diagnosis established Roth had "incurred a moderate to marked causally related spinal disability."  *Id.* at 58.  Nevertheless, Dr. Lisjak also stated that absent prior imaging, "it is impossible to know if and to what extent [Roth's] disc issues were pre-existing, especially in light of a prior motorcycle accident and his profession as a contractor."  *Id.*  No further significant functional improvement was anticipated from continued chiropractic care.  *Id.*

In a report by Defendants' expert witness, John Leddy, M.D. ("Dr. Leddy"), Professor of Clinical Orthopedics and Rehabilitation Sciences, dated December 15, 2016, R. Dkt. 77-7 at 2-7, Dr. Leddy concluded, based on the objective medical evidence in the record and review of Roth's diagnostic studies, that as a result of the collision, Roth "may have sustained a left knee medial meniscal tear," and "sustained temporary cervical and lumbar muscle strains," but that

[t]here is no indication that he had any physical examination to or treatment for his back prior to his visit with Dr. Siddiqui[23] in April of 2012. At that time the objective physical examination indicated full recovery from the muscle strains. This is consistent with his continued work in the construction field, indicating that he was not functionally limited after the accident.

R Dkt. 77-7 at 6.

Dr. Leddy found Roth's medial meniscal tear had been successfully treated by surgery, with an intact and functional ACL, and that Roth had not sustained "a significant ACL injury" as a result of the collision. *Id.* According to Dr. Leddy, Roth's spinal muscle strains had resolved, with no physical examination ever showing evidence of cervical or lumbar disc herniation or radiculopathy, and a nerve conduction study confirmed no radiculopathy, but bilateral carpal tunnel syndrome for which Roth had no symptoms early after the collision, suggesting it was not causally related to the collision, and noting "[c]arpal tunnel syndrome is a very common overuse syndrome in persons with physical jobs." *Id.* Dr. Leddy also determined Roth's right shoulder labral tear, revealed in the 2014 MRI, was not sustained in the collision given the earlier MRI in 2012 showed no labral tear. *Id.* As such, Dr. Leddy opined the labral tear was a degenerative tear which would not be unusual in light of Roth's profession. *Id.* Roth's medical records showing intermittent cervical and lumbar strains after the collision were also consistent with degeneration that could be attributed to Roth's construction job. *Id.* In short, Dr. Leddy found "no objective medical evidence that the 11/9/11 car accident directly caused traumatic L2-3 annular bulge, L3-4 bulge, L4-5 disc extrusion, or L5-S1 disc bulge with extrusion; traumatic anterolisthesis at C5-6 or traumatic central disc protrusions at C5-6

---

[23] The record on the motions before the court is otherwise devoid of any mention of Dr. Siddiqui, including any medical records and any indication as to whether Dr. Siddiqui is a medical doctor, or is engaged in the practice of any specialty.

and C6-7; traumatic bilateral carpal tunnel syndrome; traumatic left knee dislocation; or a traumatic right shoulder labral tear," *id.*, concluding that Roth's prognosis relative to the collision "was and is good." *Id.*

In an April 7, 2017 affirmation, neurosurgeon Jeffrey Lewis, M.D. ("Dr. Lewis"), who maintains he has been treating Roth for injuries sustain in the collision, avers that, upon examining Roth on August 5, 2016, he recommended an updated MRI of Roth's lumbar spine for increased pain and radicular symptoms. R Dkt. 76-1 ¶¶ 1-8. That MRI was performed on August 25, 2016, and confirmed Roth has disc herniations at L4-5 and L5-S1, as well as progression of disc bulges at L2-3 and L3-4. *Id.* ¶ 8. Dr. Lewis opined Roth's injuries are neither mild nor minimal in nature, but "quite significant in and of themselves." *Id.* ¶ 9. Because Dr. Lewis had seen no evidence that Roth was actively treating for any neck, low back, left knee or right shoulder injuries "shortly" before the collision, Dr. Lewis concluded that such injuries were caused by the collision. *Id.* ¶¶ 10-11. Although Dr. Lewis allowed that Roth "may have some underlying degeneration prior to the [collision], it is not uncommon for weaker discs to herniate[ ] and/or protrude as a result of a traumatic impact, which would correlate with [the collision]." *Id.* ¶ 14.

## DISCUSSION

**1.    Summary Judgment**

Plaintiff Roth moves for summary judgment on his claims asserted against Defendants, arguing the evidence in the record establishes the collision is attributed to Singh's negligent operation of his truck, R Dkt. 71-1¶¶ 8-19, and that Roth's resulting

injuries meet the "serious injury" threshold as required under § 5102(d), to recover for non-economic loss based on a finding of negligence.  *Id.* ¶¶ 20-49.[24]  In opposition to summary judgment, Bauman, in her capacity as Third-Party Defendant, argues Roth has not made a *prima facie* showing that he suffered a serious injury as defined under § 5102(d) as required to shift the burden of proof and survive Third-Party Defendant's summary judgment motion.  Dkt. 74-3 at 5-18.[25]  Corporate Defendants, in opposing Roth's summary judgment, argue Roth has failed to comply with Local Rule of Civil Procedure – W.D.N.Y. 56(a) requirement that a summary judgment movant provide a statement of material facts as to which the movant asserts no genuine issue need be tried, R Dkt. 77 at 22-23, that the evidence in the record fails to establish Roth sustained a serious injury as defined under § 5102(d), *id.* at 23-34, and genuine issues of material fact exist as to whether Singh or Bauman caused the collision.  *Id.* at 36-38.  In further support of summary judgment, Roth argues all medical reports from Roth's medical experts were timely disclosed, controverting statements by Corporate Defendants at ¶¶ 21-36 of their Statement of Material Facts (R Dkt. 77), R Dkt. 78 at ¶¶ 2-12, that in the only written documentation of Singh's account of the collision, Singh admits hitting Bauman's vehicle, thereby unequivocally establishing Singh's liability for negligence, *id.* ¶¶ 13-20, and that in each independent medical examination ("IME") report in the record, Roth was found to have sustained permanent and significant injuries resulting in

---

[24] The court notes Roth's attorney filed no memoranda of law but only attorney affirmations.

[25] Despite Bauman's assertion that Roth's alleged injuries sustained during the collision are not serious as defined under § 5102(d), no one has asserted any conflict of interest argument for disqualification with regard to Bauman's position as a Third-Party Defendant represented by Ferrandino in the Roth Action, and as a Plaintiff represented by Polak in the Bauman Action.

consequential loss of some bodily function, which injuries are causally related to the collision. *Id.* ¶¶ 21-35.

Third-Party Defendant Bauman moves for summary judgment seeking dismissal of the Third-Party Complaint against her, arguing the evidence in the record establishes Bauman was not negligent as a matter of law. R Dkt. 70-9 at 3-11. With regard to Bauman's motion, Roth argues because his deposition testimony and Bauman's deposition testimony are consistent with Singh's admission that Singh's truck struck Bauman's vehicle, Defendants are precluded from claiming Bauman caused the collision, Dkt. 76 ¶¶ 4-9, the medical evidence in the record establishes the injuries of which Roth complains are causally related to the collision, *id.* ¶¶ 10-21, and meet the serious injury definition under § 5102(d). *Id.* ¶¶ 35-47. In opposing Bauman's summary judgment motion, Third-Party Defendants argue there exist several issues of material fact regarding liability for the collision, precluding summary judgment. Dkt. 77 at 36-37.[26]

In further support of summary judgment, Bauman argues that discovery has shown the allegations in the Third-Party Complaint against her are without any factual basis, R Dkt. 79 at 2-3, Third-Party Plaintiffs should not be permitted to amend the Third-Party Complaint to conform with the facts revealed during discovery, *id.* at 4-5, which amendment would be so untimely as to be unduly prejudicial, *id.* at 5-7, and Third-Party Plaintiffs have failed to raise any question of law or fact to defeat Bauman's motion for summary judgment insofar as Bauman's motion attributes all cause for the collision to Singh's negligent operation of his truck. *Id.* at 7-8. In further support of

---

[26] Roth did not file papers opposing Third-Party Defendant's summary judgment motion but, rather, joins in the motion. R Dkt. 76 ¶ 3.

summary judgment against Roth, Corporate Defendants argue Roth has not opposed their summary judgment motion, R Dkt. 82 at 1-2, Corporate Defendants' statement of facts filed in support of Corporate Defendants' summary judgment motion should be deemed admitted based on Roth's failure to comply with Local Rule 56, *id.* at 2-3, Roth's medical records fail to establish that as a result of the collision, Roth sustained a serious injury under § 5102(d), *id.* at 3-4, that because Roth never disclosed Dr. Lewis as an expert, the court must disregard the Affirmation of Dr. Lewis (R Dkt. 76-1), which, in any event, is speculative because it fails to address Roth's pre-existing conditions, *id.* at 4-7, the opinions of Roth's other physicians establish Roth did not sustain a serious injury, *id.* at 7-8, Roth's knee surgery does not establish a serious injury, *id.* at 8, Roth's personal affirmation is not probative as to serious injury, *id.* at 9-10, and Roth has failed to cite to any law rebutting Corporate Defendants' arguments in support of summary judgment. *Id.* at 10.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is required to construe the evidence in the light most favorable to the non-moving party. *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be

drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Here, for Roth to obtain summary judgment, Roth must establish there is no genuine issue of material fact that Singh's negligence caused Roth to sustain a serious injury as defined under N.Y. Ins. Law § 5102(d). In contrast, summary judgment may be granted in favor of Corporate Defendants and Third-Party Defendant only if the record establishes no material issue of fact either that Singh was not negligent or that if Singh was negligent, that such negligence did not cause Roth's injuries, or that none of Roth's injuries is serious as defined under § 5102(d).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In this tort action, because the collision occurred in New York, New York law applies, *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (in tort action, New York law applies the law of the place of the tort), and the parties do not argue otherwise.

## 2.      Failure to Comply with Local Rule 56

Preliminarily, the court considers Corporate Defendants' arguments that Roth's failure to comply with Local Rule of Civil Procedure 56(a) ("Local Rule 56(a)"), both in failing to submit a statement of undisputed fact in support of Roth's summary judgment motion, Dkt. 77 at 22-23, as well as in opposing Corporate Defendants' summary judgment motion, R Dkt. 82 at 2-3, which Roth does not dispute, requires denying Roth's summary judgment motion and deeming admitted the statement of facts Corporate Defendants submitted in support of their summary judgment motion. Pursuant to Local Rule 56(a)(1), a summary judgment motion filed under Fed.R.Civ.P. 56 must be accompanied by

> a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Each such statement must be followed by citation to admissible evidence as required by Fed.R.Civ.P. 56(c)(1)(A). Citations shall identify with

specificity the relevant page and paragraph or line number of the evidence cited. Failure to submit such a statement may constitute grounds for denial of the motion.

Local R. Civ. P. – W.D.N.Y. Rule 56(a)(1).

Additionally,

The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

Local R. Civ. P. – W.D.N.Y. Rule 56(a)(2).

Although the court does not condone Roth's noncompliance with Rule 56(a), "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." Fed.R.Civ.P. 83(a)(2); *Buck v. Cleary*, 345 Fed.Appx. 660, 662 (2d Cir. Sept. 14, 2009) (finding district court abused discretion in deeming admitted defendants' statement of material facts based on plaintiff's failure to separately respond to each stated fact as required under applicable local rule, vacating lower court's decision to do so in the absence of any evidence that the failure to comply was willful, and remanding that portion of the judgment based on such deemed admitted facts). Similarly, nothing in the instant record establishes, or even suggests, Roth's failure to formally comply with Local Rule 56(a)(1) and (2) was willful. Accordingly, despite Roth's undisputed failure to comply with Local Rule 56(a)(1) and (2), the court, in the exercise of its discretion, should neither deny summary judgment to Roth, nor deem admitted Corporate Defendants' statement of undisputed facts, based on the non-compliance.

### 3.    Request to Amend

Third-Party Plaintiffs allege that "Third Party Defendant BAUMAN abruptly and without warning drove into the far right lane and failed to observe Co-Defendant SINGH who was already engaged in a lane change into the far right lane."  Third-Party Complaint (R Dkt. 4) ¶ 14.  At his August 12, 2016 deposition, however, Singh testified that at all times relevant to the collision, Singh was traveling in the center lane of I-190, R Dkt. 75-1 at 3, 8, 15, 16, and repeatedly denied that the collision occurred while Singh was attempting to change lanes, *id.* at 4, 8, or that Singh told Plaintiffs he was attempting to change lanes.  *Id.* at 5, 7-8.  In papers filed opposing Bauman's summary judgment motion, Third-Party Plaintiffs request permission to amend ¶ 14 of the Third-Party Complaint to conform with discovery, explaining their contribution and indemnification claims raised against Bauman were based upon information and belief and asserted prior to discovery, particularly Singh's deposition testimony, which shows an issue as to whether Bauman crossed into Singh's lane of travel, or remained in her lane.  R Dkt. 75 at 20-21.  Although not specifically discussed by Third-Party Plaintiffs, a determination that Singh remained at all times in the center lane would establish Bauman caused the collision, whereas a determination that the collision occurred when Bauman veered into the center lane while Singh was engaged in a lane change, as alleged in ¶ 14 of the Third-Party Complaint, would support a finding that both Singh and Bauman were negligent.  According to Third-Party Plaintiffs, discovery would have been the same regardless of whether or not the third-party claim asserted Bauman veered into the center lane in which Singh was traveling.  *Id.* at 21-22.  Bauman opposes the request to amend on the basis that the request has not been presented to

the court as a formal motion, accompanied by a proposed amended complaint as required under Rule 15, R Dkt. 79 at 4-5, such that the application for amendment is defective and must be denied. *Id.* at 5. Bauman further argues that even if the court considers Third-Party Plaintiffs' request to amend, the request must be denied because such amendment is unduly delayed as made three months after the deadline for discovery, and would result in prejudice to Bauman. *Id.* at 5-7.

Initially, assuming, *arguendo*, the District Judge agrees with the undersigned's recommendation that summary judgment be granted in favor of Corporate Defendants based on Roth's failure to establish a genuine issue of fact as to whether he sustained a serious injury as defined under § 5102(d), Bauman's request to amend is DISMISSED as moot. Alternatively, the court addresses the request to amend in the interest of completeness should the District Judge disagree with the recommendation to grant Corporate Defendants' summary judgment motion.

Despite no formal motion to amend the Third-Party Complaint having been filed, the lack of a formal motion does not require the district court deny leave to amend, with the decision to grant or deny remaining within the court's discretion. *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 68 and n. 6 (2d Cir. 2002). Nevertheless, "[o]nce the deadline for amendment in a scheduling order has passed, leave to amend may be denied 'where the moving party has failed to establish good cause.'" *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 267 (2d Cir. 2009) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)), which "'finding of 'good cause' depends on the diligence of the moving party,'" *Id.* Of further relevance is whether the amendment would significantly prejudice the nonmoving party. *Kassner v.*

*2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). The court is "particularly likely to find prejudice where the parties have already completed discovery and the defendant has moved for summary judgment." *Werking v. Andrews*, 526 Fed.Appx. 94, 96 (2d Cir. May 3, 2013) (denying motion to amend where plaintiff failed to show diligence in waiting more than two months after discovering, through deposing defendants, relevant facts, requested amendment would have required substantial additional discovery which had closed, and defendants had moved for summary judgment, such that amendment would unduly prejudice defendants).

Here, according to the February 11, 2014 Scheduling Order (B Dkt. 18), motions to amend the pleadings were to have been filed by March 20, 2014, more than three years prior to Third-Party Plaintiff's request to amend. Although "'a finding of 'good cause' depends on the diligence of the moving party,'" *Presbyterian Church of Sudan*, 582 F.3d at 267, and Third-Party Plaintiffs explain that the Third-Party Complaint was filed prior to discovery, and Third-Party Plaintiffs were unaware until after Singh's August 12, 2016, deposition that Singh denied leaving the center lane in which he was traveling northbound on I-190, thereby placing full responsibility for the collision on Bauman, R Dkt. 75 at 21-22, the subsequent delay of nearly eight months before informally requesting to amend, in papers filed April 7, 2017 opposing summary judgment, fails to establish good cause for delaying moving to amend prior to the cut-off for filing amendments. Nevertheless, the court must also consider whether any prejudice would befall any parties if the late amendment of pleadings is allowed. *Kassner*, 496 F.3d at 244. Third-Party Plaintiffs maintain that discovery would have been conducted in the same manner regardless of whether Singh was alleged to have

remained in the center lane, or alleged to have commenced changing lanes at the time of the collision, such that permitting the requested amendment will not result in any prejudice, *id.*, and Roth does not otherwise argue that any serious prejudice would ensue should Third-Party Plaintiffs be permitted to amend the Third-Party Complaint to conform with facts only revealed during discovery. Moreover, despite failing to formally move to amend and, hence, failing to file a proposed amended third-party complaint, it is possible to discern from Third-Party Plaintiff's papers precisely what they intend to allege with regard to Bauman's possible negligence relative to the collision.

Third-Party Plaintiffs' request for leave to amend ¶ 14 of the Third-Party Complaint is, alternatively, GRANTED.

## 4.     Negligence

Both Roth and Bauman move for summary judgment on the issue of negligence arguing the undisputed facts establish, as a matter of law, that Bauman was not negligent and that Singh was solely responsible for the collision. R Dkt. 70-9 at 3-11; R Dkt. 71-1 ¶¶ 8-19.[27] In particular, Roth argues that his deposition testimony was consistent with Bauman's deposition testimony, both of whom maintain Bauman's vehicle remained in the right-hand land of I-190, with Singh's truck twice making contact with Bauman's vehicle when Singh was engaged in changing from the center lane to the right-hand lane from which Singh intended to exit from I-190 to the Peace Bridge leading from the United States to Canada. R Dkt. 71-1 ¶¶ 9-10, 14. Roth also points to Bauman's assertion that she did not think it was necessary to obtain a police report because Singh admitted hitting Bauman's vehicle, *id.* ¶ 8, the physical damage caused

---

[27] Roth and Bauman also join in Third-Party Defendant's motion (R Dkt. 70) seeking summary judgment on the issue of negligence (R Dkt. 76).

by the collision, *i.e.*, scratches on the rear, driver-side panel of Bauman's vehicle and damaged lug nuts on Singh's truck's front steer tire, and Singh's unsworn statement in which Singh states he "hit" Bauman's vehicle, as supporting only a finding that Singh is liable for the collision. *Id.* ¶¶ 11, 15. Bauman argues the evidence establishes she never left the right-hand lane of I-190, R Dkt. 70-9 at 4, a fact to which both Bauman and Roth consistently testified at their respective depositions, *id.* at 4-5, Singh apologized for the collision, admitting the collision was his fault, *id.* at 4, and the damage to Bauman's vehicle was consistent with being hit from behind by Singh's truck. *Id.* at 5. According to Bauman, Singh's deposition statement that when he attempted to turn the wheel of his truck, the truck would not move, causing Singh to turn the wheel harder, hitting Bauman's vehicle, which Singh never saw prior to the collision, further placing responsibility for the collision on Singh. *Id.* at 6-7.

New York law provides that "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on a defendant's part as to the plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glen Falls City School District*, 424 N.E.2d 531, 535 (N.Y. 1981))). Following an automobile collision, the ticketing of a driver for a violation of New York Vehicle and Traffic Law ("N.Y. Veh. & Traf. Law"), generally provides *prima facie* entitlement to judgment as a matter of law against the ticketed driver. S*ee*, *e.g.*, *Reyes-Diaz v. Quest Diagnostic Inc.*, 999 N.Y.S.2d 98, 99 (2d Dep't 2014) (by demonstrating defendant violated N.Y. Veh. & Traf. Law §§ 1128(a) and 1163, plaintiff established *prima facie* entitlement to judgment as a matter of law). In the instant case, that the collision occurred when either

or both vehicles changed lanes strongly suggests either Singh or Bauman, or both, violated N.Y. Veh. & Traf. Law § 1128, which, as relevant, provides that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  N.Y. Veh. & Traf. Law § 1128(a).  Nor has any party asserted or submitted evidence regarding any violation of N.Y. Veh. & Traf. Law § 1163(d)'s requirement that a driver of an automobile signal prior to changing lanes.  No law enforcement officer, however, responded to the scene of the collision and neither Singh nor Bauman was ticketed for any traffic-related offense so there is no presumed negligence on either part.

Bauman argues, R Dkt. 70-9 at 9-11, that because the allegation in the Third-Party Complaint that "Third-Party Defendant BAUMAN abruptly and without warning drove into the far right lane and failed to observe Co-Defendant SINGH who was already engaged in a lane change to the far right lane," Third-Party Complaint ¶ 14 ("¶ 14"), is contradicted by Singh's sworn deposition testimony that he never told anyone the collision occurred while he was changing lanes, the court is required to accept Singh's sworn deposition testimony, and thereby reject Third-Party Plaintiffs' allegations in ¶ 14 such that there is no factual basis upon which to find Bauman had veered into Singh's lane when the collision occurred, requiring dismissal of the Third-Party Complaint.  In support of this argument, Bauman relies on various cases establishing the "well-settled Second Circuit rule 'that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."

*Id.* at 9-10 (quoting *Better Environment, Inc. v. ITT Hartford Ins. Group*, 96 F.Supp.2d 162, 168 (N.D.N.Y. 2000) (citing cases).  This argument fails for several reasons. Although Bauman is correct that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony," *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014), here, the record is devoid of any affidavit from Singh made either before or after Singh's deposition testimony.  As such, there can be no inconsistency between Singh's sworn deposition testimony and any affidavit by Singh.  Furthermore, even if ¶ 14 of the Third-Party Complaint were construed as the equivalent of an affidavit, because Singh has not been joined Corporate Defendants as a Third-Party Plaintiff, none of the allegations of the Third-Party Complaint, including those of ¶ 14, is attributable to Singh.[28]  Accordingly, this aspect of Bauman's motion for summary judgment on the issue of negligence should be DENIED.

With respect to the remaining arguments advanced in support of summary judgment on the issue of whether Singh's negligence caused the collision such that Singh is liable for the resulting injuries sustained by Roth and Bauman, both Roth and Bauman overlook the distinct possibility that despite the evidence in the record pointing towards Singh's possible negligence, Bauman may have been either solely or contributorily liable for the collision.

---

[28] Singh's cross-claims against Bauman for contribution and indemnification, asserted in Singh's Answer, R Dkt. 27, are devoid of any allegation that Singh was engaged in a lane-change at the time of the collision.

In short, in contrast to the allegation in § 14, to which Singh is not a party, that the collision occurred when Bauman veered into Singh's lane while Singh was attempting to change from the center lane into the right-hand lane in preparation for exiting I-190 at the Niagara Street exit, Singh steadfastly testified at his deposition that he was not attempting to change lanes when the collision occurred but, rather, was driving solely in the center lane when he heard a noise subsequent to which Singh observed Bauman's vehicle pull over to the shoulder at the right of the roadway, and Singh then pulled his truck over behind Bauman's vehicle.  R Dkt. 70-5 at 19-21. Bauman, however, is unwavering in her assertion that while she maintained her position in the right-hand lane of I-190, Singh moved from the center lane into the right-hand land, striking Bauman's vehicle twice.  R Dkt. 70-4 at 4-5.  Further, Roth's recollection at his deposition of whether, at the time of the collision, Bauman was driving solely in the right-hand lane is equivocal; specifically, in response to the query, "did Ms. Bauman remain in the curbside lane from the time that she entered the 190 headed north up until the accident took place?" Roth responded, "I don't want to say for sure.  I want to say yes, but again, it's five years.  She might have - - I don't know."  R Dkt. 70-3 at 6.  Roth also testified that at the time of the collision, Bauman's vehicle was "starting to go ahead of it [Singh's truck]."  *Id.* at 19.[29]

On this record, summary judgment should be DENIED as to the issue of negligence and liability for the collision.

---

[29] The court notes Plaintiffs' attempt to tag Singh with negligence based solely on Singh's unsworn statement, which statement Singh prepared with help because Singh is not fully proficient in the English language is somewhat lacking, yet fail to similarly accept as correct Singh's reference in the same unsworn statement to the fact that neither Bauman nor Roth sustained any injuries as a result of the collision.  The precise language in the unsworn statement by Plaintiffs includes Singh's statement, "No injuries at all.  Car was driveable and people were fine.  They didn't call police or ambulance because they were fine and had no real damage to either vehicle."  Dkt. 70-7 at 4-5.

## 5. Serious Injury

As stated, Roth and Corporate Defendants seek summary judgment on the issue of whether Roth sustained a serious injury under § 5102(d).[30] To obtain summary judgment on their respective motions on Roth's serious injury claim under § 5102(d), Roth has the initial burden of establishing by competent medical evidence that he sustained a "serious injury" within the meaning of § 5102(d), *see McHugh v. Marfoglia*, 885 N.Y.S.2d 550, 551 (4th Dep't 2009) (reversing lower court's denial of plaintiff's partial summary judgment motion on threshold issue of serious injury where plaintiff's objective medical evidence showed plaintiff suffered spine injury requiring surgery and resulting in permanent loss of ranger of motion (citing *Toure v. Avis Rent A Car Sys.*, 774 N.E.2d 1197, 1201-02 (N.Y. 2002))), whereas Corporate Defendants' initial burden is establishing by competent medical evidence that Roth did not sustain such an injury. *See Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) (recognizing threshold issue on defendant's summary judgment motion on § 5102(d) serious injury claim is whether the plaintiff sustained a serious injury within the meaning of § 5102(d) (citing *Licari v. Elliott*, 441 N.E.2d 1088 (N.Y. 1982))). In attempting to establish the plaintiff's injuries are not serious within the meaning of § 5102(d), a defendant can rely on "the affidavits or affirmations of medical experts who have examined the plaintiff and concluded that no objective medical findings support the plaintiff's claim." *Grossman v. Wright*, 707 N.Y.S.2d 233, 237 (2d Dep't 2000). Although generally, a physician's opinion is admissible as evidence only "when subscribed and affirmed by him to be true

---

[30] Although Third-Party Defendant Bauman argues in opposition to Roth's summary judgment motion that Roth cannot establish a serious injury under § 5102(d), Bauman's motion seeks summary judgment only on the issue of negligence, yet Bauman argues in opposition to Roth's summary judgment motion that Roth did not sustain the requisite serious injury.

under penalties of perjury," N.Y.Civ.Prac.L.&R 2106(a), the defendant may rely on unsworn medical records provided by the plaintiff to the defendant, although in doing so, the defendant opens the door for the plaintiff to also rely upon the same, unsworn records in opposing summary judgment. *Kearse v. New York City Transit Authority*, 789 N.Y.S.2d 281, 283-84 & n. 1 (2d Dep't 2005) (citing cases). *See also Yong Qin Luo*, 625 F.3d at 777 (in establishing its *prima facie* case, a defendant may rely upon the plaintiff's unsworn treatment records, but to rebut the defendant's showing, the plaintiff must provide affidavits, affirmations or other sworn statements). Upon establishing such a *prima facie* case, the burden shifts to the opposing party to point to evidence showing a genuine issue of material fact on this issue. *Licari*, 441 N.E.2d at 1091. Furthermore, the "[p]laintiff must present objective proof of injury, as subjective complaints of pain will not, standing alone, support a claim for serious injury." *Yong Qin Luo*, 625 F.3d at 777.

In support of his summary judgment motion, Roth asserts that his medical records conclusively establish Roth suffered a serious injury as defined under New York's No-Fault Insurance Law, N.Y. Ins. Law § 5102(d).[31] R Dkt. 71-1 ¶¶ 21-50. In opposition to Roth's summary judgment motion, both Bauman and Corporate Defendants argue that Roth's injuries do not constitute a "serious injury" under § 5102(d). R Dkt. 74-3 at 7-18 (Bauman); R Dkt. 77 at 23-33 (Corporate Defendants). In further support of summary judgment, Roth reiterates his assertions that his injuries sustained from the collision are sufficiently severe as to constitute a "serious injury" according to § 5102(d). R Dkt. 78 at 4-8. In support of their motion seeking summary

---

[31] Unless otherwise indicated, references to N.Y. Ins. Law are to McKinney 1984.

judgment against Roth, Corporate Defendants argue Roth is unable establish he sustained a "serious injury" as defined under § 5102(d), B Dkt. 55 at 12-18, or the requisite causal connection. *Id.* at 10-12.[32]

Under New York's Comprehensive Automobile Insurance Reparations Act, commonly known as the "No-Fault Insurance Law," automobile owners in New York are required to carry automobile insurance compensating injured parties for "basic economic loss" caused by the use or operation of the automobile within New York, regardless of fault. *Pommells v. Perez*, 830 N.E.2d 278, 280 (N.Y. 2005) (citing N.Y. Ins. Law §§ 5102(a), 5103). Under the No-Fault Law, a plaintiff may not sue to recover for basic economic losses such as unreimbursed medical expenses, lost wages or property damage, unless such losses exceed $ 50,000. N.Y. Ins. Law § 5102(a). Further, "[o]nly in the event of 'serious injury' as defined in the statute, can a person initiate suit against the car owner or driver for damages caused by the accident." *Id.* (quoting N.Y. Ins. Law § 5104[a]). As such, "No-Fault thus provides a compromise: prompt payment for basic economic loss to injured persons regardless of fault, in exchange for a limitation on litigation to cases involving <u>serious injury</u>." *Id.* (underlining added; citing *Montgomery v. Daniels*, 340 N.E.2d 444 (N.Y. 1975)).

"By enacting the No-Fault Law, the Legislature modified the common-law rights of persons injured in automobile accidents to the extent that plaintiffs in automobile accident cases no longer have an unfettered right to sue for injuries sustained." *Licari v. Elliott*, 441 N.E.2d 1088, 1091 (N.Y. 1982) (citing *Montgomery v. Daniels*, 340 N.E.2d 444, 453-54 (N.Y. 1975). In particular,

---

[32] Roth has not separately responded to Corporate Defendants' summary judgment motion.

Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss.

N.Y. Ins. Law § 5104(a) ("§ 5104(a)").

"Thus, to the extent that the Legislature has abrogated a cause of action, the issue is one for the court, in the first instance where it is properly raised, to determine whether the plaintiff has established a prima facie case of sustaining serious injury." *Licari*, 441 N.E.2d at 1091. As such, it "is incumbent upon the court to decide in the first instance whether plaintiff has a cause of action to assert within the meaning of the statute," *id.*, and "[i]f it can be said, as a matter of law, that plaintiff suffered no serious injury within the meaning of [§ 5102(d)], then plaintiff has no claim to assert and there is nothing for the jury to decide." *Id.* at 1092.

As relevant, a "serious injury" is defined as

A personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determinable injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

"There can be little doubt that the purpose of enacting an objective verbal definition of serious injury was to 'significantly reduce the number of automobile personal injury accident cases litigated in the courts, and thereby help contain the no-fault premium.'" *Licari v. Elliott*, 441 N.E.2d 1088, 1091 (N.Y. 1982) (quoting

Memorandum of State Executive Dep't, 1977 McKinney's Session Laws of N.Y., p. 2448).  "While it is clear that the Legislature intended to allow plaintiffs to recover for noneconomic injuries in appropriate cases, it had also intended that the court first determine whether or not a prima facie case of serious injury has been established which would permit a plaintiff to maintain a common-law cause of action in tort."  *Id.* (citing cases).

Accordingly, in the instant case, to establish a "serious injury," Roth must submit medical evidence demonstrating at least one of the nine categories of serious injury specified under § 5102(d).  Here, Roth specifies that his injuries meet four of § 5102(d)'s nine categories of serious injury, including (1) a significant limitation of use of a body function or system; (2) permanent consequential limitation of use of a body organ or member; (3) permanent loss of use of a body organ, function, member or system; and (4) medically determined injury or impairment of a non-permanent nature which prevented Roth from performing substantially all of the material acts constituting his usual and customary daily activities for at least 90 of the 180 days immediately following the collision.  R Dkt. 71-1 ¶ 39; R Dkt. 74-1 at 10; R Dkt. 77-8 at 10; B Dkt. 55-6 at 10.  In general, Roth seeks to recover for injuries to his cervical and lumbar spines, left knee, and right shoulder.[33]  The court examines whether the filed medical records

---

[33] In particular, the various injuries Roth alleges resulted from the collision include:
- straightening of the cervical lordosis;
- straightening of the lumbar lordosis
- L2-3 annular bulge;
- L3-4 annular bulge;
- L4-5 partial disc space collapse and disc extrusion with caudad migration encroaching on the L4 foramina;
- L5-S1 significant disc space collapse and bulge with extrusion abutting S1 nerve roots;
- anterolisthesis at C5-6;
- central disc protrusions at C5-6 and C6-7, C4-5 and C6-7 canal caliber is borderline;
- cyst formation at C5-6;

would support a reasonable jury's finding that any of these injuries Roth allegedly

suffered qualifies as a serious injury under any one of the four categories on which Roth

relies.

### A.    Adequacy and Disclosure of Roth's Medical Records

Preliminarily, the court addresses Corporate Defendants' contention that Roth's

medical reports and medical experts, including Drs. Sarnowski, Lisjak, and Bauer, were

inadequately and untimely disclosed requiring such medical evidence be stricken under

Fed.R.Civ.P. 37(c)(1).  R Dkt. 77 at 23-26.  In support of this argument, Corporate

---

- retrolisthesis at L4-5 and L5-S1;
- hypertrophic change at the right AC joint and lateral acromial downsloping and mild subacromial narrowing;
- numbness and tingling in the hands;
- sleep disturbance;
- popping in left knee;
- large bucket handle tear of the medial meniscus with fragment flapped laterally;
- joint effusion in left knee;
- bilateral carpal tunnel syndrome;
- left knee dislocation and tear of medial cartilage or meniscus curren;
- cervical and lumbar intervertebral disc displacement;
- clicking in neck;
- right shoulder pain, tenderness and stiffness;
- right shoulder prominent sublabral recess;
- right rotator cuff tendonitis;
- left knee effusion, tenderness, weakness and limited range of motion;
- left knee locking, popping and swelling;
- lumbago;
- cervicalgia;
- difficulty with ambulation;
- inability to bend left knee;
- knee surgery on February 7, 2012;
- crepitation of the right shoulder;
- left knee torn medial meniscus and partial tear anterior cruciate ligament;
- headaches;
- right prominent anteroinferior labral tear, Perthes type, with periosteal elevation and a para labral cyst;
- possible bony Bankart injury in right shoulder;
- tendonitis and articular surface partial thickness tearing of fibers of the infraspinatus over the footprint; and
- outlet narrowing beneath the AC joint lateral acromion and injury edema in the anterior myotendinous junction of the supraspinatus.

R Dkt. 77-8 at 4-6.

Defendants reference Roth's failure to identify any experts in responding to Corporate Defendants' interrogatory request, responding instead that "[t]he Plaintiff has not yet retained an expert witness and will supplement his response to this demand when appropriate." *See* R Dkt. 77-8, Interrogatory 18. In opposition, Roth points to his attorney's February 5, 2015 e-mail to Mary Jones, Esq. of counsel with Corporate Defendants' attorneys Wilson, Elser, Moskowitz, Edelman and Dicker, LLP, and a separate "Expert Disclosure" in which Roth identifies Drs. Bauer and Lisjak as expert witnesses, and provides No-Fault IME reports and curriculum vitae for both.[34] R Dkt, 78 ¶¶ 5-7 (citing R Dkts. 80-1 and 80-2). Corporate Defendants maintain, without reference to any case law, Roth's disclosure by e-mail on February 5, 2015, did not comply with Fed.R.Civ.P. 26(a)(2) ("Rule 26(a)(2)"), regarding expert witness disclosures.[35] R Dkt. 82 at 7 n. 2. Corporate Defendants further object to Roth's recent disclosure of Dr. Lewis, who Roth first revealed as expert witness in arguing in further support of Roth's summary judgment motion, as untimely disclosed, R Dkt. 82 at 4-5, an assertion to which Roth has not responded.

With regard to Drs. Bauer and Lisjak, Corporate Defendants have neither disputed receiving Roth's "Expert Disclosure," dated February 5, 2015, R Dkt. 80-2, nor explained why such disclosure, which unequivocally states both Bauer and Lisjak are expected to testify as experts at trial, and include copies of their respective reports and curriculum vitae, as required under Rule 26(a)(2)(B)(i), (ii), (iii), and (iv), are insufficient disclosures. The disclosures do not, however, contain any list of other cases in which

---

[34] The court notes the Second Amended Scheduling Order filed October 17, 2016 (R Dkt. 56), set October 28, 2016, as the deadline for Plaintiff to identify expert witnesses.
[35] Roth submits no evidence establishing Drs. Sarnowski or Lewis were timely identified as expert witnesses, a situation which is not further discussed by Corporate Defendants.

Drs. Bauer and Lisjak, during the previous four years, have testified as experts at trial or by deposition, as required under Rule 26(a)(2)(B)(v), nor any statement of compensation to be paid for such testimony in accordance with Rule 26(a)(2)(B)(vi). Despite the apparent deficiencies, however, Corporate Defendants have neither moved to compel Roth to provide the missing information nor formally moved to strike the reports.

As relevant here, under Fed.R.Civ.P. 37 ("Rule 37"), a party who fails to properly identify an expert witness under Rule 26(a), is precluded from relying on that witness's testimony "unless the failure was substantially justified or harmless." Fed.R.Civ.P. 37(c)(1). "Rule 37(c) is designed to prevent the 'sandbagging' of an opposing party with new evidence." *Piccone v. Town of Webster*, 2011 WL 3322550, at * 5 (W.D.N.Y. Aug. 2, 2011) (quoting *CSC Holdings, Inc. v. Berube*, 2004 WL 3541331, at *3 (E.D.N.Y. July 7, 2004) (Rule 37(c)(1) is "designed to avoid . . . gamesmanship . . . [and] . . . 'to provide a strong inducement for disclosure of Rule 26(a) material.'" (quoting *Hein v. Cuprum, S.A. de C.V.*, 53 Fed.Appx. 134, 136 (2d Cir. 2002)))). The severity of exclusion under Rule 37(c)(1) "is softened by the proviso that the penalty should not apply if the offending party's failure to disclose was 'substantially justified.'" *Id.* (quoting *Berube*, 2004 WL 3541331 at * 3). Nevertheless, "[e]ven if 'the failure was not substantially justified the exclusion should not apply if the failure was harmless.'" *Id.*

With regard to Dr. Sarnowski and Dr. Lewis, the record is devoid of any indication the identity of either doctor was disclosed prior to the instant motion, nor has Plaintiff provide any curriculum vitae, list of other cases in which either doctor has testified, or any statement regarding compensation to be paid to either doctor for their report and

testimony. The late disclosure of these physician's identity combined with Plaintiff's utter failure to comply with any of Rule 26(a)(2)(B)'s other required disclosures requires the court strike the reports. *See Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 95, 961 (2d Cir. 1997) (holding district court did not abuse discretion by precluding plaintiff's expert witness's testimony who was not timely designated as a witness, and defendant had no time to counter evidence).

With regard to the reports of Drs. Bauer and Lisjak, however, while the court does not condone the presentation of deficient expert reports that fall short of full compliance with Fed.R.Civ.P. 26(a)(2)(B)'s requirements, these reports are in substantial compliance with Rule 26(a)(2)(B), and Corporate Defendants have failed to demonstrate any prejudice or harm caused by such shortcomings, such that the court, in its discretion, will not strike them. *See Heim*, 53 Fed.Appx. at 136-37 (affirming district judge's decision, in his discretion, not to strike expert reports that failed to strictly comply with Rule 26(a)(2)(B)'s requirements absent any prejudice to plaintiff by the asserted nondisclosure). Corporate Defendants' request to strike Roth's expert reports for noncompliance with Rule 26 is DENIED as to Drs. Bauer and Lisjak, but is GRANTED as to Drs. Sarnowski and Lewis.

Third Party Defendant Bauman does not seek to strike any expert witness reports based on untimely or inadequate disclosure, but does argue that the expert report of Dr. Lisjak is not in admissible form because Dr. Lisjak is a chiropractor and not a medical doctor. R Dkt. 74-3 at 15-16. Roth has not responded to this argument.

Although not specifically stated, Bauman's argument is that insofar as New York Civ.Prac.L.& Rules § 2106(a) provides that "[t]he statement of . . . a physician . . .

authorized by law to practice in the state, who is not a party to an action, when subscribed and affirmed by him to be true under the penalties of perjury, may be served or filed in the action in lieu of and with the same force and effect as an affidavit," this rule does not pertain to chiropractors. R Dkt. 74-3 at 15 (citing *Feggins v. Fagard*, 860 N.Y.S.2d 346, 349 (4th Dep't 2008) ("the affirmed report of the chiropractor is not in admissible form inasmuch as it was not sworn to before a notary or other authorized official"). A plain review of the report prepared by Dr.Lisjak regarding his December 12, 2014 independent chiropractic medical evaluation of Roth ("December 12, 2014 ICME"), establishes it is made under penalty of perjury, but is not sworn. *See* R Dkt. 77-4 at 49-55. Dr. Lisjak's addendum to the December 12, 2014 ICME, however, is sworn to before a notary public. Whether this is sufficient to bring the December 12, 2014 ICME into compliance with Rule 2106(a), however, is merely academic because "New York state procedural rules [specifically, 2106(a)] do not apply here to a federal court sitting in diversity." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 118 (2d Cir. 2005) (citing *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 427(1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.")). In contrast, Fed.R.Civ.P. 56(c) requires evidence submitted in support of or in opposition to summary judgment be in admissible form. Under 28 U.S.C. § 1746, unsworn declarations made under penalty of perjury will suffice whenever federal law requires evidence "be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same. . . ." Accordingly, that Dr. Lisjak's December 12, 2014 ICME, made under penalty of perjury, is not sworn is irrelevant to its admissibility

in support of Roth's motion for summary judgment, or in opposing the summary judgment motions by Corporate Defendants and Third Party Defendant.

### B. Permanent Loss of Use of a Body Organ, Member, Function or System

Insofar as Roth maintains he suffered a serious injury based on the permanent loss of use of a body order, member, function or system, R Dkt. 71-1 ¶ 39; R Dkt. 74-1 at 10; R Dkt. 77-8 at 10; B Dkt. 55-6 at 10, the Court of Appeals has instructed that "to qualify as a serious injury within the meaning of the statute [§ 5102(d)], 'permanent loss of use' must be total." *Oberly v. Bangs Ambulance Inc.*, 751 N.E.2d 457, 460 (N.Y. 2001) (specifically rejecting the partial loss of use as satisfying the requirements for a permanent loss of use under § 5102(d)). Here, although Roth maintains he suffered a serious injury based on the permanent loss of use of a body organ, member, function or system, Roth never specifies the body organ, member, function or system of which Roth maintains he has permanently lost the use, nor do Roth's medical records indicate that Roth incurred any such total loss of use; rather, although Roth's medical records establish Roth has sustained injuries to his cervical and lumbar spines, left knee and right shoulder, even assuming, *arguendo*, such injuries are causally related to the collision, nothing in the record suggests, much less establishes, Roth has lost total use of any body part.

On the issue of whether Roth has lost total use of any body part, summary judgment thus should be DENIED as to Roth's motion, and should be GRANTED as to Corporate Defendants' motion.

**C.** **Permanent Consequential Limitation of Use of a Body Organ or Member/Significant Limitation of Use of a Body Function or System**

Roth alleges numerous physical problems with his cervical and thoracic spines, right shoulder and left knee, for which Corporate Defendants and Third-Party Defendant contend Roth cannot establish any resulting permanency or "significant limitation of use of a body organ, member, function or system" as required under § 5102(d). R Dkt. 77 at 23, 31-33. Corporate Defendants and Third-Party Defendant argue Roth is unable to establish he sustained anything more than a mild, minor or slight limitation of use of any body organ, member, function or system, which is insufficient to establish a serious injury under § 5102(d). R Dkt. 77 at 31-34 (Corporate Defendants); R Dkt. 74-3 at 9-16 (Bauman).

Because both a "consequential limitation" and a "significant limitation" are similarly construed as more than a "'minor, mild or slight limitation of use," *Gaddy v. Eyler*, 591 N.E.2d 1176, 1177 (N.Y. 1992) (quoting *Licari*, 441 N.E.2d 1088, 1091 (N.Y. 1982), and citing *Scheer v. Koubek*, 512 N.E.2d 309, 309 (N.Y. 1987)), the court addresses both categories together. As used in § 5102(d), the word "significant" is "construed to mean something more than a minor limitation of use." *Licari*, 441 N.E.2d at 1091. Specifically, "a minor, mild or slight limitation of use should be classified as insignificant within the meaning of [§ 5102(d)]." *Id.* Accordingly, for Roth to establish a serious injury under these categories, Roth must establish both that his injuries resulted in limited use of a body organ, member, function or system, as well as that such limitation is significant. *Licari*, 441 N.E.2d at 1092-93.

Where, as here, a plaintiff seeks recovery of damages for a serious injury based on a soft tissue injury associated with complaints of pain and loss of range of motion,

courts are to evaluate such claims with "well-deserved skepticism." *Pommells*, 830

N.E.2d at 281.  Although the medical evidence establishes Roth has several herniated

and bulging discs in his lumbar and cervical spines, a diagnosis of general disc

pathology, including a bulging or herniated disc, alone is insufficient to establish a

serious injury under § 5102(d).  *See Pommells*, 830 N.E.2d at 282 ("Proof of a herniated

disc, without additional objective medical evidence establishing that the accident

resulted in significant physical limitations, is not alone sufficient to establish a serious

injury.").  *See also Toure*, 774 N.E.2d at 1201 n. 4 (recognizing New York's "Appellate

Divisions have held that a diagnosis of a bulging or herniated disc, by itself, does not

constitute a serious injury." (citing cases)).  Rather, such claims "must be supported by

medical records and may not be based solely on plaintiff's testimony and subjective

complaints of pain."  *Jones v. United States*, 408 F.Supp.2d 107, 117 (E.D.N.Y. 2006).

Admissible objective evidence for this purpose includes X-rays, MRIs and CT scans,

use of a goniometer or inclinometer to measure range of motion, straight leg raising test

to detect pain, and other objective medical testing.  *O'Gorman v. Prus*, 10 N.Y.S.3d 830,

833 (Westchester Cty. 2015).  "'MRIs, X-rays and CT scans are objective and credible

medical evidence of a serious injury because they do not rely on the patient's

complaints of pain.'"  *Davis v. United States*, 2012 WL 88307, at * 5 (N.D.N.Y. Jan. 11,

2012) (quoting *Mastrantuono v. United States*, 163 F.Supp.2d 244, 254 (S.D.N.Y.

2001)).  The "extent or degree of physical limitation" posed by an injury also may be

proven by "an expert's designation of a numeric percentage of a plaintiff's loss of range

of motion [which] can be used to substantiate a claim of serious injury."  *Toure*, 774

N.E.2d 1197, 1200 (N.Y. 2002).  Although "there is no set percentage for determining

whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases

have generally found that a limitation of twenty percent or more is significant for

summary judgment purposes." *Hodder v. United States*, 328 F.Supp.2d 335, 356

(E.D.N.Y. 2004) (collecting cases). "[L]ess than 20% limitation has been found

insufficient to survive a motion for summary judgment." *Id.* Where, however, a

decreased ROM is asserted as proof of a serious injury, the medical findings must

indicate the methodology used to calculate the reduced ROM, as well as whether such

methodology consisted of active or passive ROM tests. *Watson-Tobah v. Royal Moving

& Storage, Inc.*, 2014 WL 6865713, at *18 (S.D.N.Y. Dec. 5, 2014) (holding medical

reports of restricted ROMs were "insufficient to overcome defendants' prima facie

showing of the absence of a serious injury" so as to meet plaintiff's burden in opposing

summary judgment because "there is no indication as to the methodology used to

calculate the degrees of restriction and whether the tests conducted were passive or

active range-of-motion tests.").

The difference between "active" and "passive" range of motion tests has been

explained by one court as follows:

> [T]here are two types of range of motion tests: passive and active. In performing
> active range of motion tests, the patient is asked to move the body part at issue
> in various directions and is asked to indicate when further movement become
> restricted or painful. In the passive range of motion test, the examiner moves the
> injured body part until the motion is restricted or pain is created. The doctor
> measures the range of the patient's ability to move the subject body part,
> sometimes with a protractor, and then compares that to the patient's 'normal'
> range of motion if the patient has a prior history with the doctor, or with what is
> considered normal of people of the same age and sex of the patient.
>
> The results of the passive test are based upon more objective criteria, because
> the doctor controls the movements. However, the fact is that most doctors will
> stop moving the patient once the patient begins to complain of pain, whether

truthful or not.  Thus, courts have required that the physician conduct objective
range of motion tests, and quantify the results of the range of motion tests.

*Hodder*, 328 F.Supp.2d at 355 (citations and quotation marks omitted).

Courts have not hesitated to dismiss claims on summary judgment where the plaintiff's

medical evidence fails to specify the objective medical tests performed or to explain

whether the ROM tests conducted were active or passive.  *See*, *e.g.*, *Hodder*, 328

F.Supp.2d at 356-57 (holding plaintiff failed to establish a serious injury under § 5102(d)

based on decreased ROM of spine where treating chiropractor failed to clarify whether

tests he conducted to elicit decreased ROM results were active or passive); *Palasek v.*

*Misita*, 734 N.Y.S.2d 587, 588 (2d Dep't 2001) (affirming summary judgment for the

defendant where, *inter alia*, plaintiff's treating physician's affidavit "failed to set forth the

objective medical tests performed by the examining physician to determine that the

plaintiff suffered specifically-quantified restrictions of motion in her neck and back.");

and *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (2d Dep't 2001) ("We have repeatedly

held that a diagnosis of loss of range of motion, because it is dependent on the patient's

subjective expression of pain, is insufficient to support an objective finding of serious

injury.").  In the instant case, Roth has submitted medical records showing he has

decreased ROM in his cervical and lumbar spines, as well as in his right shoulder, but

not in his left knee, and Roth's medical records fail to establish the methodology by

which the decreased ROM measurements were ascertained such that Roth cannot

establish he sustained under § 5102(d) a serious injury based on a permanent or

significant loss of use of a body part, member, function or system.

    In particular, on November 11, 2014, Dr. Bauer found Roth to have significantly

decreased range of motion in his right shoulder, abduction limited to 100 degrees

compared to 170 - 180 degrees for normal abduction ROM,[36] flexion limited to 100

degrees compared to 160 -180 degrees for normal flexion ROM, and external (lateral)

rotation limited to 20 degrees, with pain, compared to 80 - 90 degrees for normal

external rotation.  R Dkt. 71-2 at 2-3.  ROM for Roth's cervical and lumbar spines,

however, were not specifically stated but described as "only slightly diminished," *id.*, and

left knee ROM was measured by goniometer at 0 to 120 degrees, only slightly

decreased from the normal ROM of 0 to 135 degrees, *id*, which is considered within

normal limits and sufficient for most functional activities.[37]  Upon examination by Dr.

Bauer on January 13, 2017, both Roth's right shoulder abduction ROM and flexion ROM

had improved to 110, yet remained significantly less than the normal.  R Dkt. 71-3 at 2.

Similarly, external rotation had improved to 30 degrees compared to 180 degrees for

normal external rotation.  *Id.*  Lumbar spine ROM, however, was found to be

approximately 50% diminished in all directions with discomfort at extremes, cervical

spine ROM was diminished 75% in all directions, left and right lateral side bending were

---

[36] Although no party has submitted any evidence establishing any normal ROM, the court may take judicial notice of well-established medical assumptions.  *See Miles v. Harris*, 645 F.2d 122, 125 (2d Cir. 1981) (dissent) (observing juridical notice may be taken of "well established" medical assumptions).  *See* Fed.R.Evid. 201(b)(2) (providing court may take judicial notice of, *inter alia*, "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources who accuracy cannot reasonably be questioned.").  The range of motions on which the court here relies are published in ATTORNEYS TEXTBOOK OF MEDICINE (Third Edition), LEXIS (database updated 2017). Notably, courts within the Second Circuit have taken judicial notice of similar medical sources.  *See Hussain v. Automotive Rentals, Inc.*, 2015 WL 9581814, at *7-8, nn. 19 and 24 (E.D.N.Y. Dec. 30, 2015) (noting normal ranges of motion for knee flexion and shoulder flexion published in Normal Joint Range of Motion Study, CDC, http://www.cdc.gov/ncbddd/jointrom/); *see also Snyder v. Law*, 2010 WL 5572768, at *1 n. 1 (N.D.N.Y. Dec. 21, 2010) (taking judicial notice of definition of mental health disorder published in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (28th ed. 1994)).

[37] Range of motion for knee is typically measured using a goniometer with normal ROM considered to be 0 degrees of extension (knee completely straight) to 135 degrees of flexion (knee fully bent), and with most functional activities requiring an ROM of 0 to 117 degrees.  *See What Is the Normal Range of Motion of the Knee?*, available at: http://www.livestrong.com/article/401760normal-range-motion-knee/.

diminished 50% with cervical extension, and cervical flexion was diminished 25%.  *Id.*
ROM for both left and right knees measured with goniometer at 0 to 125 degrees.  *Id.*

Even were the court to consider the report of Dr. Sarnowski, which has been
stricken, Discussion, *supra*, at 43-44, such report does not advance Roth's argument.
Specifically, Dr. Sarnowski, a neurosurgeon, examined Roth on January 13, 2017, at
which time Roth had "some restriction of shoulder full range of motion," with a positive
straight leg raising sign on the left, indicative of a herniated disc, but sensory exam was
"grossly normal."  R Dkt. 71-4 at 1.  Dr. Sarnowski's report does not include any ROM
measurements, yet Dr. Sarnowski found Roth to be "persistently symptomatic with
regard primarily to his lumbar spine," with "disc herniation with some lumbar stenosis
and intermittent radicular symptomatology."  *Id.* at 3.  Roth's "multiple problems with
regard to knees and his shoulders" were outside Dr. Sarnowski's "area of expertise."  *Id.*
Roth "remains functional and continues to work in a less physically demanding capacity"
and his "ultimate prognosis has been guarded. . . ."  *Id.*

Based on Dr. Lisjak's December 12, 2014 ICME, Dr. Lisjak diagnosed Roth with
decreased ROM of the cervical spine, with cervical extension eliciting complaint of
crepitus, right and left rotation eliciting complaint of diffuse tightness and crepitus, and
right and left lateral flexion eliciting complaint of pulling in the opposite sides of the neck.
R Dkt. 71-5 at 3-4.  With regard to Roth's lumbar spine ROM, forward flexion was
limited to 45 degrees with discomfort, extension elicited complaints of increased lower
lumbar pressure, left and right lateral flexion elicited complaints of crepitus, and right
rotation elicited tightness complaint.  *Id.*  Roth also had positive shoulder depressor test
with bilateral upper trapezius tightness, positive Adson test on the left with crepitus and

neck pain, and positive straight leg raising test on the right with lower back pain, while neurological examination revealed increased sensitivity of Roth's left T6 and T8 dermatones, although all other sensory, motor, and reflex components of relevant neurologic levels tested were adequate and muscular symmetry of the extremities was normal. *Id.* at 4. Dr. Lisjak assessed Roth's prognosis as poor. *Id.* at 6.

Although the medical evidence in the record specifies the method used to determine the ROM for Roth's left knee, the measurements obtained fails to establish that Roth's ROM for his left knee is sufficiently decreased to establish a serious injury. Further, despite these medical reports indicating Roth had decreased ranges of motion for his right shoulder, cervical and lumbar spines, in none of the reports is the methodology by which the ranges of motion were ascertained indicated. Significantly, as discussed, Discussion, *supra*, at 49-50, the medical evidence's failure to set forth the methodology used to determine the asserted deficits in Roth's ROM is fatal to this aspect of his serious injury claim based on injury to the cervical and lumbar spines and right shoulder.

### D. The "90/180 Category"

There is no merit to Roth's contention that his injuries may be considered serious under § 5102(d)'s so-called "90/180 category," *Toure v. Avis Rent A Car Systems*, 774 N.E.2d 1197, 1204 (N.Y. 2002), pursuant to which a plaintiff may recover damages if, as a result of an accident, the plaintiff suffered a non-permanent, medically determined injury or impairment that prevented the plaintiff "from performing "substantially all of the material acts which constitute [the plaintiff's] usual and customary daily activities for not less than" 90 of the 180-day period "immediately following" the injury. N.Y. Ins. Law §

5102(d).  Qualification as a serious injury under the "90/180 category" requires the non-permanent injury to have resulted from the accident, N.Y. Ins. Law § 5104(a), and be shown to have prevented a plaintiff "'from performing his usual activities to a great extent rather than some slight curtailment.'"  *Escoto v. United States*, 848 F.Supp.2d 315, 330 (E.D.N.Y. 2012) (quoting *Thompson v. Abbasi*, 788 N.Y.S.2d 48, 49 (1st Dep't 2005)).  Despite lacking "the 'significant' and 'consequential' terminology" of the two previously discussed categories, Discussion, *supra*, at 46-53, to establish a serious injury under the 90/180 category, "a plaintiff must present objective evidence of 'a medically determined injury or impairment of a non-permanent nature.'"  *Toure*, 774 N.E.2d at 1024 (quoting N.Y. Ins. Law § 5102[d]; and *Licari*, 441 N.E.2d at 1091-92).

In the instant case, the period of time with which the court is concerned with regard to Roth establishing serious injury under the 90/180 category ends 180 days following the November 9, 2011 collision, *i.e.*, May 7, 2012.  Roth's own deposition testimony was that he continued to work at his usual construction job with Cutting Edge Contracting, a construction job Roth owns, for more than 90 of the 180 days immediately following the collision, R Dkt. 74-2 at 3-9, is fatal to his claim.  In particular, despite asserting that he sometime had to hire others to assist with heavy lifting and spreading poured concrete, *id.* at 7-8, Roth remained capable of supervising employees, *id.* at 6, and performing physical tasks at heights above his shoulders including painting, *id.* at 8-9, running electrical wire, *id.* at 9, and installing trim.  *Id.*  At other times, Roth was able to "muscle through" tasks.  *Id.*  Nor does Roth dispute that he continued working for at least 90 of the 180 days immediately following the collision; rather, Roth argues that because Corporate Defendants did not have Roth examined by

a physician within the 180 days following the collision, Corporate Defendants' expert physician is prohibited from opining as to whether Roth "suffered a qualifying injury under the '90/180' category."  R Dkt. 71-1 ¶ 43 (citing *Toussaint v. Claudio*, 803 N.Y.S.2d 564 (1st Dep't 2005)).  Although courts have held that a defendant's expert who does not examine a personal injury plaintiff until years after an automobile accident may not opine on the extent of a personal injury plaintiff's injuries within the 180 days immediately following the accident, *Toussaint*, 803 N.Y.S.2d at 565, where, as here, Roth has failed to submit anything other than self-serving and conclusory statements that fail to adequately describe the customary and usual activities which Roth alleges he was unable to perform for more than 90 of the 180 days immediately following the collision, the plaintiff cannot establish a significant injury under the 90-180 category. *See Buccilli v. United States*, 2016 WL 4940260, at * 10 (W.D.N.Y. Feb. 3, 2016) (a personal injury plaintiff's deposition testimony regarding limitations attributed to a serious injury under the 90/180 day category "must be substantiated by objective medical proof.  Self-serving statements of pain or limitation are insufficient to raise a triable issue of fact." (citing cases)).  *See also Jones v. Marshall*, 47 N.Y.S.3d 791, 793-94 (3d Dep't 2017) ("objective evidence, such as medically imposed limitations upon daily activities, must support a plaintiff's claim under the 90/180-day category; self-serving assertions in this regard will not suffice." (citing *Clausi v. Hall*, 6 N.Y.S.3d 771, 774 (3d Dep't 2015); and *Shea v. Ives*, 26 N.Y.S.3d 816, 819 (3d Dep't 2016)).  Simply, the medical records pertaining to Roth for the relevant 180-days period, *i.e.*, November 9, 2011 through May 7, 2012, consist only of diagnostic test results, such as X-rays and MRI studies, which contain no physician's opinion or remark as to whether Roth was

able to perform his usual and customary activities. *See Turchuk v. Town of Wallkill*, 681 N.Y.S.2d 72, 73 (2d Dep't 1998) (holding personal injury plaintiff's self-serving statements that she was unable to perform household chores for six months following automobile accident, without more, were insufficient to establish the plaintiff sustained a medically-determined injury that prevented the plaintiff from performing substantially all of her usual and customary daily activities under the 90/180 category).

Accordingly, summary judgment should be GRANTED as to Corporate Defendants and should be DENIED as to Roth on this aspect of his claim.

### E.    Causally Related

Although the undersigned is recommending granting summary judgment to Corporate Defendants based on the failure to Roth's medical records to establish any of Roth's alleged injuries meets the criteria to be considered "serious" under § 5102(d), in the interest of completeness, whether the evidence in the record shows the existence of any genuine issue of fact as to whether any of Roth's alleged injuries was causally related to the collision is addressed in the alternative.

In addition to establishing an injury meeting the criteria of a serious injury as defined by § 5102(d), Roth must also establish the injury was caused by the collision. Significantly, "even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury – such as a gap in treatment, an intervening medical problem, or a preexisting condition – summary dismissal of the complaint may be appropriate." *Pommells v. Perez*, 830 N.E.2d 278, 281 (N.Y. 2005). As discussed, Facts, *supra*, at 11-13, Roth has a history of preexisting injuries to his back, including his cervical and lumbar spines. It is

therefore incumbent upon the court to compare Roth's post-collision condition not only to normal ROMs for the affected joints, but also to his pre-collision ROMs. *See, e.g.,* *Pommells*, 830 N.E.2d at 287 ("In this case, with [defendant's] persuasive evidence that plaintiff's alleged pain and injuries were related to a preexisting condition, plaintiff had the burden to come forward with evidence addressing defendant's claimed lack of causation."); *Jones v. United States*, 408 F.Supp.2d 107, 119-20 (E.D.N.Y. 2006) ("While plaintiff has significant limitations in his neck and back functions, they are not the result of the January 2000 car accident; rather, they emanate from pre-existing cervical vertebrae degenerations and a disc herniation."). Toward this end, Roth's proof entirely fails because "[w]here, as here, a defendant's proof that the plaintiff has not sustained a serious injury as a result of the motor vehicle accident at issue rests in part on evidence that [ ]he had a preexisting condition prior to the accident, the plaintiff must address that contention in h[is] medical reports" or face summary judgment. *Brusso v. Imbeault*, 699 F.Supp.2d 567, 585-86 (W.D.N.Y. 2010) (citing cases). Fatal to Roth's serious injury claims based on his cervical and lumbar spine is the absence of any evidence in the record establishing Roth's cervical and lumbar spine ROMs prior to the collision, such that the court is unable to compare Roth's cervical and lumbar spine ROMs after the collision. Furthermore, even though the observation of degenerative changes prior to an accident does not necessarily preclude a determination that such degenerative changes left the plaintiff more injury-prone following a subsequent traumatic event which could aggravate preexisting injuries, *see Brown v. Miller*, 50 N.Y.S.3d 693, 693 (4th Dep't 2017) (recognizing personal injury plaintiff with preexisting degenerative changes in lumbar spine could recover for causally related serious injury

only if the plaintiff could establish collision aggravated or exacerbated preexisting degenerative condition), more than a conclusory statement from a treating physician is required to establish a causal connection. *See Pommells*, 830 N.E.2d at 286-87 (where defendant presents evidence of preexisting degenerative disc condition causing the plaintiff's alleged injuries, the plaintiff, to survive summary judgment, must provide sufficient evidence, *i.e.*, more than a mere conclusory opinion, to refute the defendant's evidence and raise an issue of fact for the jury). Here, although two of Roth's three medical experts, including Drs. Bauer and Sarnowski, have opined that Roth's cervical and lumbar spine injuries are causally-related to the collision, the opinions are merely conclusory, with no attempt to distinguish the deficit in Roth's ROM of his cervical and lumbar spine ROMs before and after the collision or to otherwise explain the basis for concluding Roth's preexisting spine conditions were aggravated or exacerbated as a result of the collision. *See* R Dkt. 71-2 at 3 (Dr. Bauer commenting, without explaining how, "Claimant's diagnoses and symptoms are causally related to the date of accident 11/09/11."); R Dkt. 71-3 at 3 (Dr. Bauer essentially commenting same); and R Dkt. 71-4 at 3 (Dr. Sarnowski conclusorily stating "I do feel that [Roth's] symptoms are related to his reported motor vehicular accident."). On December 12, 2014, however, Roth's expert witness Dr. Lisjak, a chiropractor, opined that although Roth's cervical disc protrusions appear to be, "to some degree," related to the collision, Roth was involved in a prior motorcycle accident in 1997, sustaining "significant left upper extremity injury," and "[o]steoarthritic degenerative changes, degenerative disc disease with manifest bulging and anterolisthesis all appear to be pre-existing." R Dkt. 71-5 at 6. Dr. Lisjak further commented that Roth "has evidence of pre-existing osteoarthritic degenerative

change[s] of both the cervical and lumbar spine." *Id.*  In his addendum dated January

15, 2015, prepared upon his subsequent receipt of the April 27, 2012 MRI of Roth's

lumbar spine, Dr. Lisjak continues to opine only that "it is possible" that Roth's cervical

and lumbar disc disease is causally related to the collision, *id.* at 9, with Roth appearing

"to have incurred a moderate to markedly causally related spinal disability," but that

"[w]ithout prior imaging . . ., it is impossible to know if and to what extent his disc issues

were pre-existing, especially in light of a prior motor cycle accident and his profession

as a contractor." *Id.* at 10.  In short, Dr. Lisjak's later comments succinctly summarize

why, in the presence of pre-existing medical conditions, it is necessary to be able to

compare the extent of a plaintiff's physical maladies prior to an accident so as to be able

to determine what, if any, additional physical deficit can be attributed to the accident.

Accordingly, Roth has failed to establish the existence of a genuine issue of fact on

which any reasonable jury could conclude Roth's present cervical and lumbar spine

injuries are causally related to the collision, and are not a preexisting condition, or some

aggravation of a preexisting condition.  *See Pommells*, 830 N.E.2d at 287 (finding

defendant entitled to summary judgment where personal injury plaintiff's own expert

opined the plaintiff suffered serious injuries causally related to the accident, yet also

averred the plaintiff's pain and loss of ROM were also consistent with preexisting

degenerative condition and plaintiff failed to provide any evidence as to why the expert

Acknowledgment of the preexisting condition should be discounted).

 With regard to Roth's right shoulder injury, however, no preexisting injury has

been established such that Roth's decreased ROM for his right shoulder need not be

compared to any ROM other than those considered normal for a non-injured shoulder

joint.  Roth's right shoulder diagnosis following the April 3, 2012 MRI was degenerative

disease at the AC joint, but no labral tear nor rotator cuff tear was reported.[38]  R Dkt. 77-

7 at 4.  Despite Dr. Bauer's findings of significantly limited ROM, and assuming, for the

sake of this discussion, such degenerative joint disease could be of traumatic origin, the

record is devoid of any evidence showing Roth made any complaints regarding his right

shoulder until almost five months following the collision when Roth underwent an MRI of

his right shoulder.  In fact, following the collision, Roth complained of pain not in his right

shoulder, but in his <u>left</u> shoulder for which the November 15, 2011 X-rays showed

degenerative changes of the <u>left</u> acromioclavicular joint.  R Dkt. 77-11.  Although it is

noted on the report that the April 3, 2012 MRI was conducted in connection with Roth's

complaints of pain following the collision, B Dkt. 55-7 at 8-9, and that Roth's right

shoulder condition deteriorated by April 29, 2014, when Roth underwent a second MRI

of his right shoulder, B Dkt. 55-8 at 5-6, requested by one Donald Douglas, M.D. ("Dr.

Douglas"),[39] R. Dkt. 71-5 at 3, the initial almost 5-month gap between the collision and

Roth's pain complaints is a sufficiently lengthy gap to constitute an intervening factor

severing any causality based on the collision.  *See*, *e.g.*, *Barreras v. Vargas*, 58

N.Y.S.3d 31, 32 (1st Dep't 2017) (finding defendants demonstrated absence of

causation through report of orthopedist who opined plaintiff's post-accident medical

---

[38] Although the report for Roth's April 3, 2012 MRI Right Shoulder Arthrogram was done at the request of Dr. Hoy for "pain status post MVA," B Dkt. 55-7 at 8-9, no evidence in the record indicates when Roth first sought any medical treatment for complaints of pain in his right shoulder, other than a passing reference by Dr. Lisjak in his December 12, 2014 ICME, in reviewing Roth's medical history at a February 22, 2012 examination at Genesee Orthopedics and Sports Medicine, to Roth being "assessed with bursa and tendon disorder of the shoulder region, unspecified. . . ."  R Dkt. 71-5 at 1.  Significantly, however, this record fails to identify who made this assessment as well as whether the assessment pertains to the left, right or both shoulders.

[39] The record fails to further identify Dr. Douglas, including in what, if any, area Dr. Douglas specializes, as well as when Roth began treatment with Dr. Douglas and for how long Dr. Douglas treated Roth. Nor is there any medical report from Dr. Douglas in the record.

records showed no complaints of right shoulder pain and were inconsistent with any claim of traumatic injury to right shoulder and plaintiff did not seek treatment for claimed right shoulder injuries for several months after accident); *Jones v. MTA Bus Co.*, 999 N.Y.S.2d 68, 69 (1st Dep't 2014) (plaintiff failed to raise triable issue of fact as to whether she sustained serious injury where post-accident hospital and medical records showed the plaintiff made no complaints about injuries "until about five months after the accident, which was too remote in time to establish a causal relationship."); *Henchy v. VAS Exp. Corp.*, 981 N.Y.S.2d 418, 420-21 (1st Dep't 2014) (finding no causation established where the plaintiff's medical records showed she did not receive treatment for left knee injury for six months after the accident, and MRI study showing tears was not performed until seven months after the accident and such failure to provide contemporaneous evidence of injury was fatal to serious injury claim). *But see Perl v. Meher*, 960 N.E.2d 424, 428 (N.Y. 2011) (holding evidence established genuine issue of material fact as to whether physician's specific, numerical range of motion measurements of cervical and lumbar spines, made several years after automobile accident, demonstrated plaintiff suffered from a serious injury precluding summary judgment where initial examination of the plaintiff shortly after the accident showed difficulty moving and diminished strength in cervical and lumbar spines). Further, the assessment of Roth's medical records by Defendants' expert witness, Dr. Leddy, Professor of Clinical Orthopedics and Rehabilitation Sciences, that the April 3, 2012 MRI showed no labral tear or rotator cuff tear, but only degenerative AC disease in Roth's right shoulder which is not attributed to the collision, and is further supported by the April 29, 2014 MRI showing an inferior labral tear and cyst with a large degenerative

cyst in the glenoid and evidence of impingement, findings which are indicative of a degenerative tear that developed after the collision and are typical conditions for construction workers.  R Dkt. 77-7 at 5-7.  Roth has not provided any medical evidence disputing Dr. Leddy's assessment of Roth's right shoulder condition.  Accordingly, Roth's failure to seek treatment for his right shoulder injury for almost 5 months after the collision constitutes a sufficient break rendering the collision too remote to have caused the right shoulder injury, a determination that is supported by Dr. Leddy's undisputed assessment.

Furthermore, should the District Judge disagree with the undersigned's determination, as discussed above, Discussion, *supra*, at 51-53, that the medical evidence in the record fails to establish that Roth's left knee injury is either permanent to sufficiently significant to be considered a serious injury under § 5102(d), the record does establish that Roth first complained of an injury to his left knee on November 15, 2011, when Roth first sought treatment for injuries attributed to the collision.  *See* R Dkt. 77-11 at 4 (noting reason for X-rays of left knee was pain since collision).  Although the X-rays taken of Roth's left knee on November 15, 2011 showed the knee to be intact, Roth continued to complain about pain in his left knee, R Dkt. 77-11 at 3, eventually undergoing a left knee MRI on December 15, 2011, that showed a complex tear of the medial meniscus, but intact ACL.  R Dkt. 77-7 at 2.  Even Dr. Leddy's December 15, 2016 opinion that Roth "may have sustained a left knee medial meniscal tear" during the collision, R Dkt. 77-1 at 6, is consistent with Roth attributing his left knee injury to the collision.  As such, Roth's left knee injury could be found by a reasonable jury to be causally related to the collision as required to establish a serious injury under § 5102(d).

Accordingly, Roth has failed to sufficiently distinguish the evidence in the record of preexisting injuries to his cervical and lumbar spines from the current condition of Roth's cervical and lumbar spines such that the question of whether Roth's asserted cervical and lumbar spine injuries are causally related to the collision may not be presented to a jury. Roth's failure to timely seek treatment for his right shoulder injury prevents Roth from now arguing such injury is causally related to the collision. Nevertheless, Roth's left knee injury could be found by a reasonable jury to be causally related to the collision as required to establish a serious injury under § 5102(d).

## CONCLUSION

Third-Party Defendant's motion for summary judgment (Dkt. 70), should be DENIED; Roth's motion for summary judgment (R Dkt. 71), should be DENIED; Corporate Defendants' motion for summary judgment (B Dkt. 54), should be GRANTED; Third-Party Plaintiffs' request (R Dkt. 75 at 20-22) for permission to amend ¶ 14 of the Third-Party Complaint is DISMISSED as moot or, alternatively, is GRANTED.


SO ORDERED, as to Third-Party Plaintiffs'
request to amend (R Dkt. 75 at 20-22) and
insofar as Corporate Defendants seek to
strike Plaintiff's expert witnesses,

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


Respectfully submitted, as to Third-Party Defendant's
motion for summary judgment, Plaintiff's motion for
summary judgment, and Corporate Defendants'
motion for summary judgment,

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      September 28, 2017
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 28, 2017
            Buffalo, New York